## FIRST AMERICAN NATIONAL BANK, Plaintiff–Appellant,

v.

## FIDELITY & DEPOSIT COMPANY OF MARYLAND, Defendant–Appellee.

### No. 92–6163.

United States Court of Appeals, Sixth Circuit.

Argued June 24, 1993.

Decided Sept. 28, 1993.

Robert M. Johnson, John J. Mulrooney (argued and briefed), Nimmo Bhagat, Wolff Ardis, Memphis, TN, for First American Nat. Bank.

Sam H. Poteet, Jr. (argued and briefed), Randall C. Ferguson, Daniel C. Deckbar (briefed), Manier, Herod, Hollabaugh & Smith, Nashville, TN, for Fidelity and Deposit Co. of Maryland.

Before: MARTIN, BOGGS, and BATCHELDER, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

In this diversity case from Tennessee, First American National Bank appeals the declaratory judgment granted Fidelity & Deposit Company of Maryland which denied recovery under two employee fidelity insurance policies. First American challenges the district court conclusion that the coverage terminated when Midland Bank and Trust, the predecessor bank of First American, assumed management control of the insured party, Citizens Bank of Waverly, after purchasing eighty percent of its stock at a public foreclosure sale. We believe that it did and affirm.

Several rather unusual and convoluted financial transactions are important to the resolution of this case. This saga began when, on January 22, 1981, the stockholders of Citizens Bank transferred 192,001 shares of common stock, or approximately eighty percent of the outstanding voting stock, to Citizens Holding Company. Citizens Bank was located in Waverly, Tennessee and was regulated by the state of Tennessee. The Federal Deposit Insurance Corporation insured its deposits.

The present dispute involves two bonds issued by Fidelity & Deposit on January 29 in favor of Citizens Bank. The first bond is a bankers' blanket bond that was originally issued in 1967 and was periodically renewed. The second bond is an excess employee dishonesty bond. Such a bond is intended to cover losses resulting from dishonest or fraudulent acts of bank employees who act for their own benefit with intent to harm the bank.

On January 20, 1982, Frank Woods purchased approximately 18.2 percent of the stock of Citizens Holding Company from an existing shareholder. He also received options to buy the remaining eighty-two percent of the stock from the other owners. At the next stockholders' meeting for Citizens Bank, Frank Woods and Ron Woods (no relation to Frank Woods) were elected to the board of directors. Frank Woods was named chairman of the executive committee, and Ron Woods was named president of the bank. The stockholders also voted to change the name of Citizens Bank to United Southern Bank of Humphreys County.

On June 17, Memphis Bank and Trust loaned the Citizens Holding Company approximately $2.2 million to finance Frank Woods' purchase of the holding company's

stock. Memphis Bank and Trust subsequently became Midland Bank and Trust, the predecessor bank of First American. The security for the loan was all of the stock of Citizens Holding and eighty percent of the stock of United Southern.

Early in 1983, Ron Woods agreed to help Arthur Cacaro locate financing to buy the stock of Ron Woods and Jacky Allen in another bank in Dickson County, Tennessee. On March 9, 1983, the board of directors of United Southern, including Ron Woods, discussed Cacaro's finances and authorized an increase to $600,000 in the line of credit available to Cacaro. Cacaro owed United Southern $227,000 in principal and $50,000 in interest at the time. The additional financing was to be secured by a second mortgage on Cacaro's farm. The first mortgage was for approximately $300,000, and the farm had an appraised value of $1,000,000, according to Ron Woods. At the board meeting, Woods did not disclose the fact that Cacaro intended to use the funding to acquire Woods' stock in the bank in Dickson County. Instead, Woods reported in a written memorandum to the Cacaro loan file that the purpose of the financing was to acquire and develop the Southern Hills Country Club.

On March 11, 1983, Arthur Cacaro and his wife, Candice Cacaro, executed a demand note for $600,000. On March 15, Candice Cacaro drew a check payable to Jacky Allen for $224,000. On March 16, Ron Woods disbursed $224,000 in the form of a cashier's check payable to Arthur and Candice Cacaro against the $600,000 line of credit. The Cacaros deposited the cashier's check to cover the payment to Jacky Allen. Allen later gave $112,000 of the $224,000 to Ron Woods.

After an audit in March and April of 1983, the FDIC found United Southern to be insolvent. As a result, Midland Bank demanded payment from United Southern on the loan to the holding company and later declared default. On May 9, Midland Bank bought eighty percent of the voting stock of United Southern at a public foreclosure sale. The transfer was announced on May 12 at the meeting of the board of directors of United Southern. After this announcement, the board agreed to discharge Ron Woods and other senior managers. The board also unanimously approved an agreement to merge Midland Bank and United Southern. Midland Bank shareholders, the Tennessee Department of Financial Institutions, and the FDIC also approved the merger plan. The merger was scheduled to take effect on June 30.

United Southern officials discovered the Cacaro loan loss before the merger was effective. On May 27, Cacaro's attorney sent a telegram with this information to United Southern. United Southern and the holding company gave written notice of the loss to Fidelity & Deposit through its agent, John Smith, on June 6. Smith sent notice to the wrong insurance company and then to an incorrect address. Fidelity & Deposit finally received notice of the loss on July 25. As successor in interest, Midland Bank filed its proof of loss on December 6. Fidelity & Deposit denied the claim on January 3, 1984.

On November 2, 1984, Midland Bank filed a complaint seeking a declaratory judgment, damages, and attorneys' fees. After lengthy pretrial proceedings, the case was tried without a jury in October of 1991. The district court entered judgment in favor of Fidelity & Deposit on July 22, 1992. The district court concluded that the insurance coverage terminated automatically as of May 12, 1983 under an exclusion clause in the policy terminating coverage when the insured is taken over by another institution. First American filed this appeal on August 21, 1992.

The outcome of this case hinges upon the interpretation of coverage exclusions of the applicable insurance contracts. Contract interpretation is a question of law and is subject to de novo review. *Policy v. Powell Pressed Steel Co.,* 770 F.2d 609, 612 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986). As a diversity action between an insured Tennessee citizen and an insurer licensed to do business in Tennessee, Tennessee law applies to this case. Tenn.Code Ann. § 56–7–102. A claimant under an insurance policy must prove the existence and validity of the policy and the details of the claim. *Farmers Bank & Trust Co. v. TransAmerica Ins. Co.,* 674 F.2d 548, 551 (6th Cir.1982), *cert. denied,* 459 U.S. 943, 103 S.Ct. 257, 74 L.Ed.2d 200 (1982). The burden of establishing that a loss results from a cause falling within a

policy exclusion is on the insurer. *Id.* (citations omitted). In this case, the validity of the policy and the validity of the claim were not raised as issues on appeal. Rather, the issue before us is whether the claim fell within the takeover exclusion described in the policies' termination clauses.

■ First American contends that the district court improperly concluded that coverage had ceased as of May 12, 1983. According to First American, the district court misconstrued the policies' provisions addressing termination of coverage and change of control. The two bonds contain identical provisions governing termination of policy coverage in the event of a change in ownership. The termination clause is section twelve in the bankers' blanket bond and section ten in the excess bond. The applicable portions of both termination clauses provide:

> This bond shall be deemed terminated or canceled as an entirety ... (d) immediately upon the taking over of the Insured by another institution.
>
> .     .     .     .     .
>
> Termination of the bond as to any Insured terminates liability for any loss sustained by such Insured which is discovered after the effective date of such termination.

The sections regarding change of control require the insured to notify Fidelity & Deposit of any change in ownership that results in the accumulation of ten percent or more of the voting stock in different hands. The exact wording in both policies is as follows:

> When the Insured learns of a transfer of its outstanding stock which results in a change of control of the Insured, it shall within 30 days give written notice to the Underwriter....
>
> As used in this General Agreement, control means the power to determine the management or policy of the Insured by virtue of voting stock ownership. A change in ownership of voting stock which results in direct or indirect ownership by a stockholder or an affiliated group of stockholders of ten percent (10%) or more of the outstanding voting stock of the insured shall be presumed to result in a change of control for the purpose of the required notice.
>
> Failure to give the required notice shall result in termination of the coverage of this bond....

To decide whether coverage was cancelled in this case, we must determine which language from the policies applies to the present dispute. First American contends that coverage was not cancelled in this case because a takeover did not occur. First American concedes that there was a change of control as described in the policies but argues that a change of control is not necessarily a takeover and does not automatically result in termination of coverage. According to First American, the district court improperly construed the takeover language to nullify the change of control language. We disagree. Both provisions can be applied without rendering either section meaningless because the sections are distinguishable in purpose and applicability. The purpose of the change of control section is to require notice to the insurer when ownership changes hands. The purpose of the termination clause, however, is to provide that coverage will automatically be terminated under certain circumstances, including takeovers. Each provision operates independently of the other even though a transaction may possibly constitute both a takeover and a change of control. Although a change of control alone will not result in termination of coverage, coverage ceases automatically if a transaction constitutes a takeover. Consequently, if we find that a takeover has occurred, we need not examine the notice requirements expressed in the section on change of control.

■ In light of the preceding distinction, our primary inquiry is whether there was a "taking over of the Insured" under the meaning of the insurance contracts. First American argues that the phrase "taking over" is an ambiguous term. We disagree. We cannot adopt any unexpressed meaning of the phrase merely to create ambiguity where none exists. The court is not authorized to pervert language or exercise its creative powers to find other meanings for a term expressed with sufficient clarity to reflect the parties' intent. *Ballard v. North American Life & Casualty Co.,* 667 S.W.2d 79, 82 (Tenn.Ct.App.1983).

■ Where there is no ambiguity in the terms of the contract, the court should apply

to the words used their ordinary and usual meaning. *Id.* at 82. In the Random House Dictionary (2d ed. 1987), "takeover" is defined as "the act of seizing, appropriating, and arrogating authority, control, management, etc." This ordinary and plain meaning of the term "takeover" does not necessarily require the transfer of absolute title.

Based on the plain meaning of the term "takeover," a takeover occurred when Midland Bank assumed management control over the insured bank. The date of the takeover is determinative of the date when coverage ceased. On May 12, 1983, Midland Bank officials announced their management plans, including the dismissal of Ron Woods and other senior managers, to the board of directors of United Southern. The United Southern directors indicated their support by approving the merger plan. Therefore, Midland Bank took over United Southern as of May 12.

Because the bonds were cancelled on May 12, we need not address First American's remaining argument regarding whether knowledge of the loss on the part of the Fidelity & Deposit agent, John Smith, could be imputed to Fidelity & Deposit. The insurance coverage had ceased prior to the time John Smith became aware of the loss.

Accordingly, we affirm the judgment in favor of Fidelity & Deposit.