**FERRO CORPORATION, Plaintiff–Appellee/Cross–Appellant,**

v.

**GARRISON INDUSTRIES, INC., Defendant–Appellant/Cross–Appellee.**

Nos. 96–3703, 96–3771.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 5, 1997.

Decided April 28, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied June 10, 1998.*

* Judges Nelson and Moore recused themselves from participation in this ruling.

Randall G. Vaughan (argued and briefed), Kevin P. Doyle and William D. Toney (briefed), Pray, Walker, Jackman, Williamson & Marlar, Tulsa, OK, Suellen Oswald (briefed), Duvin, Cahn & Hutton, Cleveland, OH, for Defendant–Appellant/Cross–Appellee..

Laura Kingsley Hong (argued and briefed), Thomas G. and Marcel C. Duhamel (briefed), Squire, Sanders & Dempsey, Cleveland, OH, for Plaintiff–Appellee/Cross–Appellant..

* The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. PyroChek LM is a low molecular weight version of a line of brominated polystyrenes which,

Before: KEITH and SUHRHEINRICH, Circuit Judges; ROSEN, District Judge.*

**OPINION**

ROSEN, District Judge.

### I. INTRODUCTION

This cross-appeal concerns the arbitrability of a Custom Manufacturing Agreement entered into by the parties. When a dispute arose concerning the agreement, Defendant–Appellant Garrison Industries, Inc. filed a demand for arbitration, alleging breach of contract. Plaintiff–Appellee Ferro Corporation initially engaged in the arbitration, but later collaterally attacked Garrison in both state and federal court.

At the center of the dispute is the District Court's ruling that the issue of fraudulent inducement of the contract was justiciable under Ohio law, and not subject to arbitration in the first instance, and its ruling vacating the arbitration award.

### II. PROCEDURAL AND FACTUAL BACKGROUND

On March 17, 1992 Plaintiff Ferro Corporation ("Ferro") and Defendant Garrison Industries, Inc. ("Garrison") executed a requirements contract, known to the parties as the Custom Manufacturing Agreement ("CMA"). In the CMA, Garrison agreed to manufacture for Ferro a Ferro-developed product known as PyroCheck LM, which was intended for use as a flame retardant additive to certain thermoplastics.[1] Garrison promised to manufacture at least 1.5 million pounds of PyroCheck LM per year, and as much as 3 million pounds per year. Ferro agreed to pay Garrison $250,000 up front to purchase and upgrade Garrison's manufacturing equipment, so that Garrison could manufacture PyroCheck LM, and to accept and pay for (at the rate of 90 cents per pound) the PyroCheck LM that Garrison produced. The CMA had an initial term of two years, contained a standard arbitration

when added to thermoplastics, give those thermoplastics certain flame retardant characteristics.

clause drafted by Ferro, and an Ohio choice-of-law provision.

Upon executing the contract on March 17, the parties agreed that Garrison would begin production of PyroCheck LM as soon as Garrison completed certain upgrades to its facilities as contemplated by the contract. However, Garrison did not begin to produce PyroCheck LM until May 28, 1992 because in addition to spending time making the upgrades agreed to by the parties, Garrison needed time and money to repair damage to its facilities caused by a tornado on May 9, 1992.[2]

During the next several months, Garrison continued to produce PyroCheck LM as it experimented with various chemical production processes. Although the product Garrison manufactured did not always meet Ferro's specifications [3] and the quantity produced fell short of the contract minimums, Ferro purchased all of the product Garrison produced through March 26, 1993.[4] On March 26, 1993, however, Ferro ordered Garrison to cease production of PyroCheck LM and later told Garrison it did not intend to purchase any more of the Pyro-Check LM that Garrison might produce, and sent a contract termination letter to Garrison in December of 1993.

Despite Ferro's expressed desire to discontinue its relationship with Garrison, Garrison sought payment from Ferro for the balance of the roughly 2.2 million pounds of PyroCheck LM that Ferro had promised it would buy from Garrison. Ferro refused, prompting Garrison to invoke the arbitration clause of the CMA on April 25, 1994. Ferro responded on May 15, 1994 with a counter-claim in arbitration. The arbitration was scheduled for January 9, 1995. Just before the arbitration was to begin, however, the parties engaged in a whirlwind of procedural moves and counter-moves.

On December 2, 1994, Ferro filed an action in state court seeking to enjoin the arbitration and have the court rescind the contract because Garrison had fraudulently induced Ferro to enter into the CMA. Ferro contemporaneously filed, with the arbitration panel, a motion to stay the arbitration proceedings pending the litigation. On December 20, 1994, the arbitration panel denied the motion to stay the arbitration proceedings. Ferro immediately sought to stay the arbitration proceedings anyway, by filing a motion for a temporary restraining order to stay the arbitration in its state court action. The state court set the matter for hearing on December 22, 1994.

On December 21, 1994, before the state court had ruled on Ferro's motion for a temporary restraining order, Garrison removed the action to the United States District Court for the Northern District of Ohio, where it was assigned to Judge Kathleen M. O'Malley. Ferro's counsel appeared in Judge O'Malley's chambers in federal court on December 21, 1994, seeking an emergency meeting with the Court and requesting immediate issuance of a temporary restraining order, so that Ferro's counsel could avoid preparing for the impending arbitration. Since Judge O'Malley was not in chambers, she communicated through her clerk to Ferro's counsel (after being reached by telephone) that the Court declined to rule on the motion immediately, but that the Court would hold a hearing on the motion before the arbitration was scheduled to commence. Ferro's counsel, either refusing or unable to understand this ruling, then went to Judge Aldrich, who was the "emergency/miscellaneous judge" on duty at that time, and asked

---

2. Garrison argues that the delay in commencing production was due to: (1) not receiving a permit to use Ferro-specified solvent until April 28, 1992; and (2) the failure of a third party vendor chosen by Ferro to obtain a Department of Transportation permit to ship bromine chloride via train until May 23 or 24, 1992.

3. The arbitration panel found that PyroChek LM manufactured by Garrison was chemically indistinguishable from PyroChek LM manufactured by Ferro. (R. 31, Ex. A, at 11–12).

4. According to the District Court opinion, the amount of product purchased as 701,800 pounds. However, Ferro claims the district court's factual finding is clearly erroneous because, "[i]t is uncontroverted that Ferro took 1,138,046 pounds of product and paid Garrison approximately $2,366,467.04 for it." (Ferro's Brief, p. 5–6). This disparity is inconsequential for the purposes of resolving the issues presented in this appeal.

her to issue a temporary restraining order on the grounds that Judge O'Malley was "unavailable" to consider Ferro's request. Judge Aldrich's clerk learned from Judge O'Malley's chambers what had already transpired, and quite properly refused to present the matter to Judge Aldrich. The next day, Judge O'Malley set a hearing on the motion for a temporary restraining order for January 5, 1995, and consolidated the hearing to include a hearing on Ferro's request for preliminary injunctive relief. Also on December 22, 1994, the state court—apparently unaware that the case had been removed to federal court—issued the requested temporary restraining order. Of course, the state court no longer had jurisdiction over the dispute, so the state court's order was null and void. Nonetheless, Ferro sent a copy of the void order to the arbitration panel.[5]

On December 28, 1994, Garrison moved the District Court to refer all issues raised in the complaint (including Ferro's fraudulent inducement claim) to arbitration. Essentially, Garrison opposed Ferro's request for an injunction and sought an order declaring that the question of whether it had fraudulently induced Ferro to enter the CMA was an issue that only the arbitrators could resolve. Judge O'Malley ordered that the issues raised in Garrison's motion would also be heard at the January 5, 1995 hearing.

At the time of the January 5, 1995 hearing, Ferro had asserted only one basis for its claim of fraudulent inducement: that it was induced into entering the CMA by Garrison's false representation that Garrison was capable of manufacturing for Ferro the minimum quantities of PyroCheck LM using a specific, agreed-upon chemical manufacturing process. As noted, *infra*, later, Ferro added a second basis for its claim of fraudulent inducement: that it was induced into entering the CMA by Garrison's false representation that Garrison sustained only minor, cosmetic damage from the tornado. These two claims are referred to, respectively, as the 'production fraud claim' and the 'tornado fraud claim.'

After conducting the scheduled hearing, Judge O'Malley declined the parties' requests for declaratory or injunctive relief and set the case for trial. The Court held that the issue of whether Garrison fraudulently induced Ferro to enter the agreement was non-arbitrable under Ohio law, and thus retained jurisdiction over that claim. Nonetheless, the Court declined to stay the arbitration. Regarding Ferro's motion for an order restraining the arbitration from going forward, the Court found, among other things, that Ferro had failed to establish a likelihood of success on the merits of its production fraud claim. The Court also noted:

> [The production] fraudulent inducement claim is belated in that both parties had previously invoked the arbitration clause, the arbitration has begun and was under way, [and] the arbitration panel has had an opportunity to have not only an initial hearing but to set a more detailed hearing on the question of liability ... [U]nder these circumstances, ... the public interest is more in favor of allowing the arbitration to proceed, *especially an arbitration that the parties clearly agreed to with such broad terms, and an arbitration under an arbitration clause that the plaintiff does not dispute that it itself drafted.*

Hearing Tr. at 8–9 (Jan. 5, 1995) (emphasis added).

The Court, therefore, denied the motion for a temporary restraining order, but enjoined the arbitration panel from "resolving the ultimate question of whether the contract at issue in this case has been fraudulently induced." Following the issuance of this Order, the arbitration panel reset the pending arbitration to begin on January 10, 1995. The Court set the trial of Ferro's production fraud claim for April 18, 1995.

Over Ferro's objection, the arbitration panel chose to bifurcate its proceedings, separating its hearings into liability and damages phases. The arbitration panel heard evidence going to liability on January 10–12,

---

**5.** It is unclear whether Ferro knew Garrison had removed the lawsuit to federal court when Ferro sent a copy of the state court's restraining order to the arbitration panel. It is clear, however, that when Ferro learned Garrison had removed the action and, therefore, that the state court order was void, Ferro did not then reveal this fact to the arbitration panel.

1995. At that hearing, Garrison, for the first time, raised the issue of tornado damage suffered by its manufacturing facility as a defense to the claim that it unreasonably delayed its production of PyroChek LM. Specifically, Garrison claimed that the March 9, 1992, tornado damage had been so extensive that it was unable to begin the upgrades to its facility necessary to manufacture Pyro-Chek LM until late April or early May, 1992.

On February 27, 1995, the panel issued its report and found that "Ferro is liable to Garrison for an amount to be determined at a subsequent hearing." The parties then began to prepare for the arbitration hearing on damages. Ferro requested, and belatedly received, discovery from Garrison regarding the tornado. It was only then that Ferro learned the great extent of the physical damage Garrison had suffered from the tornado. The tornado damage to Garrison's plant was so severe that Ferro determined it had a second basis for its claim of fraudulent inducement—that is, it was induced into entering the CMA by Garrison's false and misleading representation that Garrison sustained only minor, cosmetic damage from the tornado. Accordingly, Ferro amended its complaint in this case on April 5, 1995, to state its tornado fraud claim.

As the court's trial date of April 18, 1995 approached, it became clear that the related arbitration proceedings were not going to be concluded by that date. On April 10, 1995, Garrison moved to continue the trial until after the arbitrators had entered a damages award. The Court granted the motion in relation to the production fraud claim, but allowed the trial to go forward on the tornado fraud claim.

The Court had made its decision to stay the litigation in deference to the arbitration panel's jurisdiction and "because it found that the ongoing arbitration might have an impact upon, even be binding upon, its decision with respect to the [production fraud] claim." Other reasons the Court had for staying the litigation of the production fraud claim included: (1) if the Court found against Ferro on its production fraud claim, which appeared weak on the merits, the arbitration would have to occur anyway; (2) the fact findings of the arbitration panel could con-

ceivably moot the issues left for the Court to decide; and (3) it appeared the arbitration might resolve the entire dispute expeditiously.

Accordingly, as of April 18, 1995, the arbitration and litigation moved forward, partially in parallel. The Court agreed to hear evidence regarding the tornado fraud claim, while the parties continued to present to the arbitrators evidence regarding the production fraud claim. Because the factual issues surrounding the tornado fraud claim were only before the Court, and not the arbitration panel, the Court was not concerned that going forward on the tornado fraud claim would interfere with the arbitration panel's jurisdiction. Thus, the district court determined that it would only hear evidence regarding the tornado claim and would hear evidence regarding the production fraud claim at some later date, if necessary, after the arbitration panel had concluded its proceedings.

Beginning on April 18, 1995, the Court held a three day bench trial on the tornado fraud claim. The Court found clear and convincing evidence supporting the claim that Garrison had made material and intentional misrepresentations to Ferro regarding the tornado damage, and that the tornado fraud claim was well taken. The Court then went on to consider the appropriate remedy. While the Court was still considering the appropriate remedy, the arbitration panel announced it would hold a hearing on the question of damages on May 8, 1995. The Court then entered an order that Garrison had fraudulently induced Ferro to enter the agreement and held that: (1) the CMA be rescinded to the extent not performed; (2) rescission as to that portion of the CMA performed prior to March 26, 1993 was inappropriate; and (3) Ferro was not entitled to the return of the initial $250,000 paid to Garrison upon execution of the CMA.

Due to the Court's ruling, Ferro refused to participate in the damages hearing before the arbitration panel. Ferro claimed that the arbitrators lacked the authority to act and made it clear to the panel that it would not voluntarily abide by any decision the arbitrators reached. Ferro also refused to attend the damages hearing, indicating that it feared it might waive a challenge to the arbitrators' jurisdiction by doing so. On

May 9, 1995, the arbitration panel issued its final award. The arbitration panel affirmed that Ferro was liable and awarded damages in excess of $1.6 million. The trial court subsequently vacated the arbitration award, and this appeal ensued.

### III. ISSUES ON APPEAL

The central issue in this appeal is whether Ferro's defense of "fraudulent inducement" to Garrison's breach of contract claim is arbitrable under the Custom Manufacturing Agreement. The resolution of this issue requires the Court to determine whether the District Court erred in determining that Ohio law governed the issues to be arbitrated, and, that under Ohio law "fraudulent inducement" is not an arbitrable claim.[6]

### IV. STANDARD OF REVIEW

 In this case, the Court must review the District Court's interpretation of the CMA and its interpretation of Ohio law. "Contract interpretation is a question of law and is subject to de novo review." *First American Nat'l Bank v. Fidelity & Deposit Co.*, 5 F.3d 982, 984 (6th Cir.1993)(citing *Policy v. Powell Pressed Steel Co.*, 770 F.2d 609, 612 (6th Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986)). A district court's interpretation of state law is also governed by the de novo standard on appeal. *Stanford Ranch, Inc. v. Maryland Casualty Co.*, 89 F.3d 618, 624 (9th Cir.1996); *Reynolds v. School District No. 1*, 69 F.3d 1523, 1536 (10th Cir.1995).

### V. ANALYSIS

#### A. ARBITRABILITY OF FRAUDULENT INDUCEMENT CLAIM

##### 1. *Arguments of the Parties*

The CMA contained a written clause, drafted by Appellee Ferro, providing for arbitration, which stated:

All controversies and claims arising out of or relating to this Agreement, or the breach of this Agreement, shall be settled by arbitration in Cleveland, Ohio, in accordance with Commercial Arbitration Rules of the American Arbitration Association.

Appellant Garrison argues that under this clause, the issue of fraudulent inducement should have been decided by the arbitration panel and not the District Court, contending that because the CMA involved interstate commerce, the arbitration agreement contained therein is subject to § 2 of the Federal Arbitration Act, which provides that written provisions for arbitration "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or equity for the revocation of any contract." 9 U.S.C.A. § 2.

Under the Supreme Court's interpretation of the FAA, the issue of fraudulent inducement of the entire contract is an issue to be resolved by the arbitration process, in the absence of evidence that the contracting parties intended to withhold the issue from arbitration. *Prima Paint Corp. v. Flood & Conklin Mfg.*, 388 U.S. 395, 403, 87 S.Ct. 1801, 1805–06, 18 L.Ed.2d 1270 (1967). Thus, Garrison ultimately contends that the District Court should not have ruled on the issue of fraudulent inducement, and urges this Court to remand the matter to the original arbitration panel.

Appellee Ferro argues that the Ohio choice-of-law provision in the CMA should be read as incorporating Ohio's arbitration laws and, therefore, the claim of fraudulent inducement should be judicially determined.[7] Since the FAA was enacted with the intention of providing enforcement of private arbitration agreements, the arbitration clause in

---

**6.** Cross–Appellant Ferro submits three additional issues for appeal: (1) whether the District Court erred in failing to award Ferro the initial $250,-000.00 it paid to Garrison upon execution of the CMA where the District Court held that the CMA was void ab initio; (2) whether the District Court erred in failing to grant Ferro full rescission of the CMA despite its holding that the CMA was void ab initio; and (3) whether the District Court erred in failing to award Ferro damages incurred as a consequence of Garrison's having fraudu-

lently induced Ferro to enter the CMA. As the Opinion makes clear, the Court's ruling on the issue of the arbitrability of the fraudulent inducement defense makes the resolution of these issues moot.

**7.** The choice-of-law provision in the CMA read as follows:

The Parties hereto agree that all of the provisions of this Agreement and any questions concerning its interpretation and enforcement

the CMA should only be enforced to the extent allowed under Ohio law. Ferro argues that the Supreme Court's decision in *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) indicates that the FAA does not necessarily preempt state arbitration law. Therefore, under *Volt,* the Ohio choice-of-law clause was an effective and valid election that Ohio's procedural arbitration rules should govern. Ferro further contends that under Ohio law, the issue of fraudulent inducement is an issue for judicial determination, and, thus, urges this Court to affirm the District Court's ruling.

Garrison responds that the inclusion of an Ohio choice-of-law provision was not intended to avoid federal arbitration law. Garrison relies on the Supreme Court's more recent decision in *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 58–60, 115 S.Ct. 1212, 1217, 131 L.Ed.2d 76 (1995), in which the Court held that a choice-of-law provision did not limit the authority of the arbitrators, but simply governed the rights and duties of the parties. Even if Ohio law governs, Garrison argues that Ohio law does not, and cannot, require judicial resolution of fraud in the inducement of a contract involving interstate commerce.

### 2. *FAA Purpose and Applicability*

 We begin our analysis with a review of the FAA and its purpose. The FAA was enacted to provide for enforcement of privately entered agreements to arbitrate. *See, Mastrobuono,* 514 U.S. at 52–54, 115 S.Ct. at 1214 (the central purpose of the FAA is to ensure "that private agreements to arbitrate are enforced according to their terms.")(quoting *Volt,* 489 U.S. at 469, 109 S.Ct. at 1250–51). Such a pronouncement seems unnecessary considering that the common law of contracts dictates that an agreement between two parties shall be enforced as written, absent exceptional circumstances such as fraud or unconscionability. But the law was necessary to overcome judicial reluc-

tance to allow arbitration, rooted in an antiquated unwillingness to cede power to other decision-making tribunals. *See, Allied–Bruce Terminix Companies, Inc. v. Dobson,* 513 U.S. 265, 270, 115 S.Ct. 834, 837–38, 130 L.Ed.2d 753 (1995)(American courts, perhaps standing upon the "antiquity of the rule," initially followed the English practice of prohibiting arbitration clause enforcement). The Supreme Court has recognized that through the FAA, Congress has "declared a national policy favoring arbitration and withdrew the power of states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve be arbitration." *Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984). *See also, Allied–Bruce,* 513 U.S. at 270–71, 115 S.Ct. at 837–38 (in passing the FAA, Congress was motivated by a desire to change the anti-arbitration rule)(citing and quoting *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 220, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985)). Thus, in reaching our decision today, we are mindful of the Supreme Court's teaching that "[t]he Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself, or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).

The Supreme Court has recognized only two limitations on the enforceability of arbitration agreements subject to the FAA: (1) they must be a part of either a maritime contract or a contract dealing with interstate commerce; and (2) arbitration agreements may be revoked "upon grounds as exist at law or in equity for the revocation of any contract." *Southland,* 465 U.S. at 10–11, 104 S.Ct. at 858. Furthermore, the Supreme Court sees "nothing in the act indicating that the broad principle of enforceability is subject to any additional limitations of state

shall be governed by the laws of the State of Ohio, USA exclusive of its choice of law

rules. . . .

law." *Southland,* 465 U.S. at 11, 104 S.Ct. at 858.

■ In determining the validity of an arbitration agreement contained in a contract subject to the FAA, the Supreme Court has held that once a court determines that the agreement to arbitrate has not been fraudulently induced, all other issues falling within that agreement are to be sent to arbitration. In *Prima Paint,* the Supreme Court ruled:

Accordingly, if the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the 'making' of the agreement to arbitrate—the federal court may proceed to adjudicate it. [footnote omitted] But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally. * * *

We hold, therefore, that in passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate. In so concluding, we not only honor the plain meaning of the statute but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts.

*Prima Paint,* 388 U.S. at 403–04, 87 S.Ct. at 1806. *See also, Campaniello Imports, Ltd. v. Saporiti Italia S.p.A,* 117 F.3d 655, 666 (2nd Cir.1997)(while fraud in the inducement of making the agreement to arbitrate may be adjudicated by the court, the statutory language of the FAA does not permit a federal court to consider claims of fraud in the inducement of the contract generally); *R.M. Perez & Associates, Inc. v. Welch,* 960 F.2d 534, 539 (5th Cir.1992)("If the fraud relates to the arbitration clause itself, the court should adjudicate the fraud claim. If it relates to the entire agreement, then the Federal Arbitration Act requires that the fraud claim be decided by an arbitrator."); *Arnold v. Arnold Corporation,* 920 F.2d 1269, 1278 (6th Cir.1990). Therefore, the arbitration agreement is effectively considered as a separate agreement which can be valid despite being contained in a fraudulently induced contract. *Prima Paint,* 388 U.S. at 405–07, 87 S.Ct. at 1807.

■ In this case, the arbitration agreement in the CMA provides:

*All controversies and claims arising out of or relating to this Agreement, or the breach of this Agreement, shall be settled by arbitration* in Cleveland, Ohio, in accordance with Commercial Arbitration Rules of the American Arbitration Association. (emphasis added).

Under the Supreme Court's interpretation of the FAA, the issue of fraudulent inducement of a contract is to be decided by an arbitrator, unless the making of the arbitration clause itself was fraudulently induced. Here, Appellee Ferro drafted the arbitration agreement contained in the CMA and has not asserted that the arbitration agreement was fraudulently induced. Thus, under the broad language of the CMA, and the relevant precedent, Ferro's claim of fraudulent inducement of the entire agreement should have been adjudicated by the arbitration panel.

### 3. *Effect of the Choice–of–Law Clause*

■ Appellee Ferro argues, however, that the inclusion of a choice-of-law clause was intended to limit the application of the arbitration agreement. The District Court ruled that by inserting the choice-of-law clause into their arbitration agreement, the parties expressly contracted to be bound by the laws of Ohio, thus precluding application of the FAA. A transcript of the hearing, in which Judge O'Malley ruled on the record, reveals that the District Court relied on three cases: *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989); *Public Service Credit Union v. Ernest,* 988 F.2d 627 (6th Cir.1993); and *Armco Steel Co., L.P. v. CSX Corp.,* 790 F.Supp. 311 (D.D.C.1991). However, the District Court's reliance on those cases was misplaced not only because they are distinguishable from the instant case, but also because it was bound to follow the Supreme Court's more recent decision in *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 58–60, 115 S.Ct. 1212, 1217, 131 L.Ed.2d 76 (1995).

In *Volt*, Stanford Junior University and Volt Information Sciences had executed a construction contract which contained an arbitration clause, and a choice-of-law provision which operatively selected California law. When a dispute arose regarding compensation for extra work, Volt made a formal demand for arbitration. Stanford responded by suing the contractor in California state court for fraud and breach of contract, and sought indemnity from two other companies involved in the design and management of the project, with whom it did not have arbitration agreement. Volt made a motion to compel arbitration pursuant to § 4 of the FAA and under the parallel provision of the California Arbitration Act, which the court denied. The court proceeded to grant Stanford's motion to stay the arbitration pursuant to the California Arbitration Act, which permits a court to stay arbitration pending resolution of related litigation involving third parties not subject to arbitration.

The Supreme Court was faced with the issue of whether the application of the California Arbitration Act's stay provision "would undermine the goals and policies of the FAA." *Volt*, 489 U.S. at 478, 109 S.Ct. at 1255. The Court noted that the central policy of the FAA was to enforce arbitration agreements in accordance with their terms, and concluded that the agreement to incorporate California law was consistent with the goals of the FAA:

> In recognition of Congress' principal purpose of ensuring that private arbitration agreements are enforced according to their terms, we have held that the FAA preempts state laws which "require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland Corp. v. Keating*, 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984). [Additional cites omitted]. But it does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself. Indeed, such a result would be quite inimical to the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms. Arbitration under

> the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, see *Mitsubishi*, supra, 473 U.S., at 628, 105 S.Ct., at 3354, so too may they specify by contract the rules under which that arbitration will be conducted. Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the Act would otherwise permit it to go forward. By permitting the courts to "rigorously enforce" such agreements according to their terms, see *Byrd*, supra, 470 U.S. at 221, 105 S.Ct. at 1242, we give effect to the contractual rights and expectations of the parties, without doing violence to the policies behind by the FAA.

*Volt*, 489 U.S. at 478–79, 109 S.Ct. at 1255–56.

Although the Court affirmed the decision allowing the integration of the California rules into the agreement in circumstances somewhat to analogous to those present in the instant case, *Volt* is distinguishable for several reasons. First, *Volt* did not present a situation in which state and federal law were in conflict. Unlike the California Arbitration Act, which the Supreme Court read into the *Volt* contract, the FAA does not contain a provision which addresses the problems raised by multi-party disputes in which only some of the parties have entered into arbitration dispute agreements. *Id.* at 476 n. 5, 109 S.Ct. at 1254 n. 5. Thus, the laws at issue in *Volt*—the California Arbitration Act and the FAA—did not conflict because the FAA does not have a provision, nor does any case law exist, addressing the issue of whether a court may stay arbitration pending resolution of related litigation involving third parties not subject to arbitration. In the instant case, however, if we accept Ferro's (and the District Court's) interpretation of Ohio law, the relevant provisions of state law and the

---

FAA appear to conflict.[8]

■ The FAA states that an arbitration agreement shall be valid "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2. The Supreme Court has interpreted this phrase to mean that only claims for fraudulent inducement of the arbitration clause itself may be heard by a court, *Prima Paint*, 388 U.S. at 403–04, 87 S.Ct. at 1805–06, whereas Appellee Ferro argues that Ohio law holds that claims for fraudulent inducement of the entire contract must be decided by a court. In short, accepting Ferro's characterization of Ohio law arguendo, the FAA and Ohio law directly conflict, and the state law is preempted. See, *Volt*, 489 U.S. at 477, 109 S.Ct. at 1255 ("when Congress has not completely displaced state regulation in an area, state law may nonetheless be pre-empted to the extent that it actually conflicts with federal law—that is, to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' ")(quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Therefore, following Ohio law would clearly contravene the Supreme Court's interpretation of § 2 of the FAA by requiring the issue to be resolved in a judicial forum.

Second, in *Volt* the Supreme Court did not itself initially interpret the contract as incorporating the California arbitration rules into the arbitration clause, but only accepted the California court's interpretation of the clause. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 60, 115 S.Ct. 1212, 1217 n. 4, 131 L.Ed.2d 76 (1995). In *Mastrobuono*, discussed in greater detail *infra*, the Court distinguished *Volt* by noting that its task was to review a lower federal court's interpretation of the contract, and rather than employing a deferential standard, as it did in *Volt*, the Court made its determination de novo:

> The dissent makes much of the similarity between this choice-of-law clause and the one in *Volt*, which we took to incorporate a California statute, allowing a court to stay arbitration pending resolution of related litigation. In *Volt*, however, we did not interpret the contract de novo. Instead, we deferred to the California court's construction of its own state's laws. 489 U.S., at 474, 109 S.Ct., at 1253 ("the interpretation of private contracts is ordinarily a question of state law, which this Court does not sit to review"). In the present case, by contrast, we review a federal court's interpretation of this contract, and our interpretation accords with that of the only decision-maker arguably entitled to deference—the arbitrator.

8. While the Court here accepts Ferro's interpretation of Ohio law arguendo, the Court is not certain that the Ohio Supreme Court would rule as Ferro claims if faced squarely with the issue presented here. While there seems to be some confusion among Ohio courts in how to apply the Ohio arbitration provisions, the Court believes the Ohio Supreme Court would allow the issue of fraudulent inducement of an entire contract to be arbitrated under a broad arbitration agreement. Ferro's reliance on a number of Ohio cases dealing with the Ohio Consumer Sales Practice Act (CSPA) is misplaced because it fails to take into consideration the differences between the CSPA and the Ohio arbitration statute, and the similarities between the Ohio arbitration statute and the FAA.

Indeed, the Ohio arbitration statute provides that a written arbitration provision "shall be valid, irrevocable, and enforceable, except upon grounds that exist at law or in equity for the revocation of any contract." Ohio Rev.Code § 2711.01. That language is nearly identical to the § 2 of the FAA, which provides that such agreements "shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract." In the recent case of *Williams v. Aetna Finance Co.*, 65 Ohio St.3d 1203, 602 N.E.2d 246 (1992), Justice Wright dissented because he felt the court should have made a clearer statement of the law regarding the fraudulent inducement of the entire contract versus the fraudulent inducement of the arbitration agreement. In his dissent, Justice Wright cited *Prima Paint*, and stated that "[w]hile the validity of the entire contract is left to the arbitrator to decide, the validity of the arbitration agreement itself is "saved" for the court's decision by section 2 of the Act." *Id.* at 1206, 602 N.E.2d 246.

Thus, the nearly identical language of the FAA and Ohio's arbitration law, coupled with Justice Wright's dissent, leads this Court to believe that if squarely faced with the issue presented here, the Ohio Supreme Court would follow the persuasive authority of *Prima Paint* in construing Ohio's arbitration statute, which is effectively identical to the FAA.

*Mastrobuono,* 514 U.S. at 60 n. 4, 115 S.Ct. at 1217 n. 4. *See also, National Union Fire Ins. Co. v. Belco Petroleum Corp.,* 88 F.3d 129, 134 (2nd Cir.1996)("But the Court in *Volt* relied on the California state court's construction of the parties' agreement to incorporate certain California rules"); *Paine-Webber Inc. v. Elahi,* 87 F.3d 589, 594 n. 5 (1st Cir.1996)("In *Volt,* the Supreme Court deferred to the California court's finding under state contract law that the parties had intended their choice-of-law clause to adopt California rules governing arbitration procedures. [Cite omitted]. Here, we must determine de novo what the parties intended by their choice-of-law clause, and we follow *Mastrobuono.*"). The same procedural posture of the case obtains here, and this Court must review the District Court's interpretation of the CMA and Ohio law de novo. *See, First American,* 5 F.3d at 984; *Stanford Ranch,* 89 F.3d at 624. Because we are unconstrained by a deferential standard of review, this Court must follow *Mastrobuono* and join the long line of cases distinguishing *Volt,* effectively limiting its applicability to cases with a similar procedural posture.

Third, the Supreme Court's recent decision in *Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996), appears to further narrow the applicability of *Volt.* In *Doctor's Associates,* the Court held that the FAA preempted a Montana statute which limited the validity of arbitration agreements by conditioning their enforceability on compliance with several notice requirements. In distinguishing that case from *Volt,* the Supreme Court stated:

> The Montana Supreme Court misread our *Volt* decision and therefore reached a conclusion in this case at odds with our rulings. *Volt* involved an arbitration agreement that incorporated state procedural rules, one of which, on the facts of that case, called for arbitration to be stayed pending the resolution of a related judicial proceeding. The state rule examined in *Volt* determined only the efficient order of proceedings; it did not affect the enforce-

ability of the arbitration agreement itself. We held that applying the state rule would not "undermine the goals and policies of the FAA," 489 U.S., at 478, 109 S.Ct., at 1255, because the very purpose of the Act was to "ensur[e] that private agreements to arbitrate are enforced according to their terms," *id.,* at 479, 109 S.Ct., at 1256.

> Applying § 27–5–114(4) here, in contrast, would not enforce the arbitration clause in the contract between DAI and Casarotto; instead, Montana's first-page notice requirement would invalidate the clause. The "goals and policies" of the FAA, this Court's precedent indicates, are antithetical to threshold limitations placed specifically and solely on arbitration provisions. Section 2 "mandate[s] the enforcement of arbitration agreements," *Southland,* 465 U.S., at 10, 104 S.Ct., at 858, "save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2. Section 27–5–114(4) of Montana's law places arbitration agreements in a class apart from "any contract," and singularly limits their validity. The State's prescription is thus inconsonant with, and is therefore preempted by, the federal law.

*Doctor's Associates,* 517 U.S. at 688, 116 S.Ct. at 1656–57.

The Court's characterization of the California law at issue in *Volt* as merely determining the efficient order of proceedings appears to be another attempt by the Court to limit *Volt* to its facts. Of course, in the instant case, the Ohio law does not relate to the efficient order of the proceedings, but rather determines conclusively which forum—arbitration or judicial—should entertain Ferro's defense of fraudulent inducement of the contract. As in *Doctor's Associates,* the application of Ferro's construction of the Ohio state law would lead the Court to effectively abrogate the arbitration agreement *in toto,* rather than simply establish the efficient order of proceedings.[9]

---

[9]. The District Court also stated that it was bound by this Court's decision in *Public Sv. Credit Union v. Ernest,* 988 F.2d 627 (6th Cir.1993), which examined the Michigan arbitration statute. (R.

80, TR 3–4). But *Ernest* is distinguishable because the parties there agreed in the district court proceedings that Michigan statute M.C.L. §§ 600.5001(2) controlled their agreement to ar-

Although it considered the above distinguishable cases, the District Court failed to apply and follow the rationale set forth in *Mastrobuono.* In *Mastrobuono,* customers of a securities firm alleged that the defendant firm had mishandled their account and initiated arbitration pursuant to the terms of their client agreement.[10] An arbitration panel awarded the plaintiffs both compensatory and punitive damages. The securities firm filed a motion in district court to vacate the award because, although the rules to which that arbitration clause referred provided for the award of punitive damages, New York law did not allow arbitrators to award punitive damages. In determining the effect of the choice-of-law clause the Court stated:

> We think the best way to harmonize the choice-of-law provision with the arbitration agreement is to read "the laws of the state of New York" to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators. Thus, the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers arbitration; neither sentence intrudes upon the other.

*Mastrobuono,* 514 U.S. at 63–64, 115 S.Ct. at 1219. Therefore, the Court ultimately declined to read the choice-of-law clause as incorporating into the agreement the New York state law prohibition against allowing arbitrators to award punitive damages. Furthermore, the Court noted that even if the choice-of-law clause introduced an ambiguity into the contract, the defendant securities firm could not "overcome the common-law rule of contract interpretation that a court should construe ambiguous language against

the interest of the party that drafted it." *Id.* at 62, 115 S.Ct. at 1219.

Here, our central inquiry is whether the incorporation of Ohio law is consistent with the primary purpose of the FAA, i.e., to ensure that the agreement to arbitrate between Ferro and Garrison is enforced according to its terms. In this case, the Court finds no indication that the parties intended to incorporate Ohio law to determine that the issue of fraudulent inducement should be adjudicated in a judicial forum. As in *Mastrobuono,* the arbitration clause is conspicuously broad, as it applies to "[a]ll controversies and claims arising out of or relating to this Agreement...." Given this broad language, the Court does not believe that the parties intended to incorporate Ohio law, or invoke the power of courts, to determine the scope of the arbitration agreement. Thus, we harmonize the provisions of the CMA in the same manner as the Court in *Mastrobuono:* by ruling that the choice-of-law clause is not an "unequivocal inclusion" of the Ohio rule which arguably holds that the issue of fraudulent inducement is one for a court, and not an arbitrator, to decide. *See, National Union Fire Ins. Co. v. Belco Petroleum,* 88 F.3d 129 (2nd Cir.1996).

This decision not only finds resonance in the decisional law of other circuits, but also in policy and common sense. In *Belco,* the Second Circuit held that the preclusive effect of prior arbitration was a question for the arbitrator, rather than the court. The Second Circuit rejected Belco's argument that the district court should have applied New York law, rather than federal law, pursuant to a choice of law clause in the contract. Belco based its argument for the incorporation of New York law primarily on the *Volt*

---

bitrate. Thus, this Court reversed the district court because it relied on a decision interpreting the FAA, rather than applying the law to which the parties had stipulated.

The Court is also unpersuaded by *Armco Steel Co., L.P. v. CSX Corp.,* 790 F.Supp. 311 (D.D.C. 1991), in which the court held that the FAA did not compel arbitration where the parties had agreed to be governed by Ohio law, which had the effect of relieving parties from arbitrating when there is an allegation that the contract was a product of a violation of the antitrust laws. *Armco* failed to cite *Prima Paint,* and to acknowl-

edge the difference between a wrongfully induced arbitration agreement and a wrongfully induced contract. To the extent it neglected to acknowledge this critical distinction, we find that decision is unpersuasive.

10. The parties' client agreement stated: "This agreement ... shall be governed by the laws of the State of New York. Unless unenforceable due to federal or state law, any controversy arising out of or relating to [my] accounts ... shall be settled by arbitration...." *Mastrobuono,* 514 U.S. at 59 n. 2, 115 S.Ct. at 1217 n. 2.

decision. In rejecting Belco's argument, the court distinguished *Volt* because of its procedural posture, then went on the cite *Mastrobuono* at length. Ultimately the court ruled:

> Similarly, we are not persuaded that the parties here agreed to incorporate into their agreement to arbitrate New York law on which forum decides the preclusive effect of a prior arbitration. The AIG Policy contains a broad arbitration clause and a New York choice-of-law clause, both similar to the relevant provisions construed in *Mastrobuono*. Nothing in the arbitration clause gives any indication that anyone other than the arbitrator should decide the preclusive effect of a prior arbitration. As in *Mastrobuono*, we decline to read the choice-of-law clause in the AIG Policy as referring to "New York decisional law, including that State's allocation of power between courts and arbitrators, notwithstanding otherwise-applicable federal law." 514 U.S. at 60, 115 S.Ct. at 1217; see also *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1200 (2d Cir.1996). We find no reason not to harmonize the arbitration and choice-of-law clauses precisely as the Court did in *Mastrobuono*. In sum, the choice-of-law clause is not an unequivocal inclusion of a New York rule that requires the preclusive effect of a prior arbitration to be decided by the court because there is another—and we think more persuasive—way to read the clause that adheres closer to the federal policy in favor of arbitration.

*Belco*, 88 F.3d at 134–35. *See also, PaineWebber Inc. v. Elahi*, 87 F.3d 589 (1st Cir. 1996)(the court quoted *Mastrobuono* at length, and distinguished *Volt* in a footnote based upon the procedural posture of that case; relying on *Mastrobuono*, the court held that the parties contractual choice of New York law did not require a judicial determination of the effect of an NASD time bar).

■ The Court's ruling is also supported by both the policy of the FAA and by common sense. The policy of the FAA is to enforce privately entered agreements to arbitrate, and to resolve any doubts concerning the scope of arbitrable issues in favor of arbitration consistent with the national policy favoring arbitration. *Mastrobuono*, 514 U.S. at 52–54, 115 S.Ct. at 1214; *Moses*, 460 U.S. at 24–25, 103 S.Ct. at 941–42; *Southland*, 465 U.S. at 10, 104 S.Ct. at 858. Accepting Ferro's interpretation of the agreement would vitiate the policy aims of the Act by enabling litigants to effectively abrogate the FAA's applicability to Ohio contracts by pleading fraudulent inducement. That is, a party that wanted to avoid arbitration would simply assert that the contract was fraudulently induced, thereby removing the case from the jurisdiction of the arbitrators, and vesting it with a court. Though the court's jurisdiction over the matter would terminate subsequent to it determining whether or not the contract was fraudulently induced, the litigation would vitiate the primary benefit of arbitration, i.e., the expeditious, inexpensive resolution of disputes.

Furthermore, as Justice Brennan points out in his dissent to *Volt*, "the normal purpose of such choice of law clauses is to determine that the law of one state rather than that of another state will be applicable; they simply do not speak to any interaction between state and federal law." *Volt*, 489 U.S. at 488, 109 S.Ct. at 1261. Most contracts include a choice-of-law clause, and, thus, if each of these clauses were read to foreclose the application of the substantive law enacted by Congress in the FAA, the FAA would be applicable in very few cases. Such an interpretation of the FAA is simply not viable, as it would effectively emaciate the Act itself.

## VI. CONCLUSION

■ Under the plain language of FAA, and the Supreme Court's interpretation of the FAA, the issue of fraudulent inducement of an entire contract is an issue to be decided through arbitration. The arbitration clause was drafted broadly to include "all controversies and claims arising out of or relating to this agreement," and must be construed against the party that drafted the clause, which in this case was Ferro. Although Ferro attempts to narrow the scope of the clause, if Ferro had intended to either exclude the issue of fraudulent inducement from arbitration, or only allow for arbitration to the extent allowed under Ohio law, it could have written this proviso into the clause.

Therefore, we hold that the District Court erred in asserting jurisdiction over the issue of fraudulent inducement of the entire contract, and that the District Court's interpretation of the law wrongfully usurped the province of the arbitrators as provided in the arbitration clause agreed to by the parties. Arbitration is a creature of contract, and parties should, absent the most extenuating and explicit of circumstances, be required to arbitrate those disputes which they agree to arbitrate. Therefore,

IT IS HEREBY ORDERED that the District Court ruling is REVERSED and VACATED;

IT IS FURTHER ORDERED that the case be REMANDED to the arbitration panel for completion of the arbitration process.[11]

---

11. The parties raised a total of eight issues on appeal. As the Court did not expressly address each of the issues in the text of the opinion, for the sake of clarity the Court will set forth how each of the issues was resolved by the Court's opinion. Appellant Garrison raised five issues:

 1. Whether Ferro's defense of "fraudulent inducement" to Garrison's breach of contract claim is arbitrable under the Custom Manufacturing Agreement;

 2. Whether the District Court erred in determining that Ohio law governed the issues to be arbitrated and, if not;

 3. Whether the District Court misinterpreted Ohio law by holding that "fraudulent inducement" is not an arbitrable claim;

 4. Whether the District Court erred in vacating the Arbitrators' Final Award dated May 9, 1995; and

 5. Whether the case should be remanded to the Arbitration Panel for completion of the arbitration process.

Issues 1 and 2 were obviously addressed in the text of the opinion, in which the Court ruled that the fraudulent inducement claim was arbitrable, and that the District Court erred in asserting jurisdiction over that claim. The resolution of Issue 3 is not necessary because the Court accepted Ferro's interpretation of Ohio law arguendo (although the Court's views on the accuracy of Ferro's interpretation is addressed briefly in footnote 9). As to issues 4 and 5, because the Court ruled that the District Court wrongfully asserted jurisdiction over the case, it logically follows that it erred in vacating the arbitrator's award and that the case should be remanded to the arbitration panel.

Cross-Appellant Ferro submits three additional issues for appeal:

 6. Whether the District Court erred in failing to award Ferro the initial $250,000.00 it paid to Garrison upon execution of the CMA where the District Court held that the CMA was void *ab initio*;

 7. Whether the District Court erred in failing to grant Ferro full rescission of the CMA despite its holding that the CMA was void *ab initio*;

 8. Whether the District Court erred in failing to award Ferro damages incurred as a consequence of Garrison's having fraudulently induced Ferro to enter the CMA.

Because the District Court did not have jurisdiction to make a determination as to whether the contract was fraudulently induced, it did not have authority to vacate the arbitration award. Therefore, issues 4, 5, and 6, are moot because the District Court was without jurisdiction to consider whether Ferro was entitled to restitution, recission, and damages.