ORDER
 

 SPIEGEL, Senior District Judge.
 

 This matter is before the Court on Defendants’ Motion to Compel Arbitration and Dismiss Count IV of the Complaint (doc. 4); Plaintiffs Response (doc. 11); Defendants’ Reply (doc. 12); Plaintiffs Motion for Partial Summary Judgment
 
 *876
 
 (doc. 16); Defendants’ Response (doc. 20); Plaintiff’s Reply (doc. 24); and the Declaration of Terry Hill in Support of Plaintiffs Motion for Partial Summary Judgment (doc. 25).
 

 BACKGROUND
 

 On July 15, 1999, Plaintiff Bratt Enterprises, Inc. (hereinafter, “Bratt” or “Plaintiff’), an Ohio corporation which has its principal place of business at Cincinnati, Ohio, filed suit in a diversity action against Defendant Noble International, Ltd., a Delaware corporation which has its principal place of business at Bloomfield Hills, Michigan, and Defendant H & H Steel Processing, Inc. (hereinafter, collectively referred to as “Noble” or “Defendants”), which is a wholly owned subsidiary of nonparty Noble Metal Processing-Midwest, Inc. (formerly known as [Defendant] H & H Steel Processing, Inc. and Utilase Blank Welding Technologies, Inc.), a Michigan corporation which has its principal place of business at Bloomfield, Michigan
 
 (see
 
 docs. 1 & 6).
 

 According to the original Complaint that was filed on July 15, 1999, Bratt sold the assets of H & H Steel Processing Company, Inc. to Noble Processing-Midwest, Inc. (doc. 1). This transaction was memorialized in an Asset Purchase Agreement (hereinafter, the “Purchase Agreement”) and a Performance Premium Agreement (hereinafter, the “Premium Agreement”)
 
 (see
 
 doc. 4, Exs. A
 
 &
 
 B). Specifically, Plaintiff asserts against Defendants three claims for breach of contract that allegedly resulted in several million dollars in damage to Plaintiff (doc. 1). In addition, Plaintiff seeks a declaration that Defendants may not avoid paying Plaintiff the sums owed under the Purchase Agreement and the Premium Agreement (hereinafter, collectively referred to as the “Agreements”), which are now properly due and owing by Defendants, under the terms and conditions of the Agreements
 
 (Id.).
 

 Shortly thereafter, Plaintiff filed an Amended Complaint asserting a fifth cause of action claiming that Defendants wrongfully converted refunds that were overpaid by Plaintiff to the Ohio Bureau of Workman’s Compensation when Plaintiff originally owned H & H Steel Processing Company, Inc. (doe. 2).
 
 [1]
 
 Defendants filed their Answer denying Plaintiffs claims for breach of contract, declaratory judgment and conversion, as well as defending against Plaintiffs claims with a total of fifteen affirmative defenses (doc. 5). In their Answer, Defendants assert a total of four counterclaims against Plaintiff, which include several allegations of breach of contract by Plaintiff for accounts receivable and undisclosed liabilities that are allegedly owed to Defendants
 
 (Id.).
 

 On October 12,1999, Defendants filed an Amended Answer moving this Court to allow them the right of set-off against any claims that were asserted against Defendants by Plaintiff in its Amended Complaint (doc. 5).
 
 [2]
 
 The following facts are taken from the Amended Complaint, the Amended Answer and the Parties’ briefs that were submitted to this Court.
 

 Noble International, Ltd., Utilase Blank Welding Technologies, Inc. (hereinafter,
 
 *877
 
 “Utilase”), H & H Steel Processing Company, Inc., Terry Hill, and Robert G. Kreiling entered into an Asset Purchase Agreement dated September 30, 1998 (doc. 5). Under this Purchase Agreement, Uti-lase agreed to purchase certain assets and assume certain liabilities of H & H Steel Processing Company, Inc.
 
 (Id.).
 
 According to the §§ 1.3(a) and (b) of the Purchase Agreement, Noble agreed to pay $13,108,-159.12 (over thirteen million dollars) to Bratt (or to third parties on behalf of Bratt) in partial satisfaction of Noble’s “Purchase Price” obligation
 
 (see
 
 docs. 11 & 16). In addition, § 1.3(c) of the Purchase Agreement also contained a procedure for calculating post-closing adjustments to the Purchase Price
 
 (Id.).
 

 After the closing of the Purchase Agreement (hereinafter, the “Closing”), Utilase changed its name to H & H Steel Processing Company, Inc. (hereinafter, “H
 
 &
 
 H Steel” or the “Company”), and, subsequently, to Noble Metal Processing-Midwest, Inc., which is a nonparty and a wholly owned subsidiary of another nonparty, Noble Technologies, Inc., which is a wholly owned subsidiary of Defendant Noble International, Ltd.
 
 (Id.).
 

 Effective October 1, 1998, under the terms and conditions of the Purchase Agreement, Plaintiff alleges that Defendants agreed to the following terms and conditions:
 

 (1) pay Bratt $5,270,382.80 at the October 1,1998 Closing;
 

 (2) pay The Provident Bank $5,668,-281.52 on behalf of Bratt at the Closing;
 

 (3) pay Bratt an amount equal to the actual cash expenditures for property, plant, and equipment of the North Vernon Plant of the H & H Steel business for the period July 31, 1998, to the date of Closing;
 

 (4) pay Bratt $1,500,000.00 for Bratt’s expense in acquiring a 50% partnership interest in Precision Blanking Limited;
 

 (5) pay Bratt a minimum of $500,000.00 and a maximum of $2,000,000.00 under an ancillary Performance Premium Agreement;
 

 (6) undertake responsibility for payment or discharge of certain designated liabilities;
 

 (7) lease real estate in Cincinnati, Ohio from Bratt for a minimum of one year;
 

 (8) pay Bratt $140,927.20 within five days of Plaintiffs delivery of evidence to Defendants that Plaintiff satisfied certain liens on the H & H Steel business; and
 

 (9) pay Bratt up to $50,000.00 as reimbursement to Bratt for transaction expenses related to the Purchase Agreement.
 

 (doc. 2).
 

 In addition, Plaintiff asserts in Count II of the Amended Complaint that, after the October 1, 1998 Closing, Noble promised to pay Bratt $140,927.20 upon Noble’s receipt of proof that Bratt satisfied certain tax liens, as set forth in paragraph 6(h) (docs. 2 & 25). Plaintiff further asserts that, although proof of the paid tax liens has been provided to Defendants, they have refused to pay the almost $141,000 outstanding debt
 
 (Id.).
 

 Moreover, Plaintiff contends in Count I of the Amended Complaint that, even though Noble agreed to pay for Bratt’s expenditures on property, plant, and equipment at the North Vernon Plant of the H
 
 &
 
 H Steel business through the date of Closing, Noble still owes Bratt $110,-874.00 for Bratt’s “Actual Cash Expenditures,” as set forth at paragraph 6(c)
 
 (Id.).
 
 Plaintiff also contends that, even though Noble agreed to pay Bratt as much as $50,000 for Bratt’s transaction expenses, as set forth at paragraph 6(g), Plaintiff maintains that Noble owes it an additional $10,000 because Noble has reimbursed Bratt only $40,000 of the $50,000 owed
 
 (Id.).
 
 Furthermore, Plaintiff alleges in Count V of the Amended Complaint that, it is entitled to a 1995/1996 worker’s compensation refund of $30,554 that Noble has wrongfully converted for its own use by
 
 *878
 
 refusing to reimburse Bratt the $80,554 which rightfully belongs to Plaintiff (Id).
 

 Lastly, in Count IV of the Amended Complaint, Plaintiff moves this Court for a declaratory judgment of its rights under the Agreements (Id). Specifically, Plaintiff asserts that, according to the Premium Agreement, Noble agreed to pay Bratt between $500,000 and $2,000,000 over, at most, a five-year period as a “Premium Payment” based on the performance of the H & H Steel business during the period of 1999 to 2003 (Id). However, Plaintiff alleges that Noble has represented to Bratt that, it does not intend on paying Bratt the minimum sums which must be paid under the Premium Agreement (Id). Thus, according to Plaintiff, Defendants have allegedly performed an anticipatory breach of the Agreements (Id). Plaintiff moves this Court to decree a declarative judgment as to Count IV and monetary relief against Defendants in the principal amount of $292,355.20 as requested in Counts I, II, III and V of the Amended Complaint, plus any other damages, interests, costs, and attorney fees as permitted by law for the “undisputed, actual breach and the anticipatory breach” of the Agreements by Defendants (Id).
 

 In contrast, Defendants allege that, under § 1.3(a)(ii) of the Purchase Agreement and as part of the Purchase Price of the assets, Noble agreed to pay Bratt “an amount equal to the actual cash expenditures for property, plant and equipment of the Company relating to the North Vernon Plant between July 31, 1998 and the Closing, as shown in the Closing Balance Sheet (determined as set forth in Section 1.3(c) below)” (doc. 12). Defendants maintain that, since the amount of actual cash expenditures could not be determined as of the date of Closing, the Parties estimated the amount to be $669,494.80 and Noble paid Bratt the same at Closing, pursuant to § 1.3(b)(ii) of the Purchase Agreement (Id).
 

 Following the Closing, Defendants contend that the Parties to the Purchase Agreement provided a method for making final adjustments to the purchase price, if needed (doc. 12). Specifically, under § 1.3(c)(i), Defendants assert that Noble was required to prepare and deliver to Bratt a Closing Balance Sheet in order to determine the amount of Assumed Liabilities and any adjustments that were necessary, pursuant to §§ 1.3(a)(iii) and 1.3(d) of the Purchase Agreement (Id).
 

 In their Amended Answer, Defendants allege in Counterclaim I that, under §§ 1.2 and 1.3(a)(v) of the Purchase Agreement, Noble agreed to assume certain Assumed Liabilities of the Company, as defined in the Purchase Agreement (doc. 6). Moreover, under § 1.2 of the Purchase Agreement, Defendants allege that, the Parties agreed that Noble would not be required to assume and would have no further liability or obligation, direct or indirect, absolute or contingent, with respect to any other “Retained Liabilities,” as defined in the Purchase Agreement (Id). After the Closing, Defendants assert that they were entitled to receive $632,238.00 from Bratt as compensation for the excess accounts payable that constituted a Retained Liability, as defined in the Purchase Agreement (Id).
 

 In Counterclaim II, Defendants contend that, the Purchase Agreement provides that, in the event any of the “Accounts Receivable” were not collected within ninety (90) days of the Closing, Noble would be entitled to offset the amount of such uncollected Accounts Receivable against the Purchase Price paid to Bratt (Id). Defendants submit that they are entitled to receive $80,738.00 from Bratt pursuant to the Purchase Agreement as compensation for the uncollected Accounts Receivable (Id). Furthermore, in Counterclaim III, Defendants assert that, Bratt agreed to indemnify and hold harmless Noble from all losses created by its breach of warranty (Id). Specifically, Defendants allege that Noble is entitled to receive $712,605.00 from Bratt as compensation for undis
 
 *879
 
 closed liabilities, as defined in the Purchase Agreement
 
 (Id.).
 

 In Counterclaim IV, Defendants also allege that Bratt presented Noble with the Company’s audited balance sheets from December 31, 1997, 1996 and 1995, and the related audited statements of operations, shareholders’ equity and cash flows for each of those fiscal years, as well as the unaudited balance sheet of the Company as of June 30, 1998
 
 (Id.).
 
 In addition, Defendants assert that Bratt warranted that these balance sheets would fairly represent the financial position of the Company as of those respective dates
 
 (Id.).
 

 Defendants argue that, because of the misrepresentation on the part of Bratt, Noble is entitled to receive $51,091.00 from Bratt, pursuant to the Purchase Agreement, as compensation for these unsupportable, fixed asset items
 
 (Id.).
 
 Thus, according to Defendants, the four counterclaims asserted in their Amended Answer, totaling at least $1,476,672.00 (almost one and a half million dollars), must be set-off against Plaintiffs Amended Complaint claims totaling $292,355.20
 
 (Id.).
 

 On September 21, 1999, Defendants filed a Motion to Compel Arbitration and to Dismiss Count IV of the Complaint (doc. 4). Shortly thereafter, Plaintiff filed its Response (doc. 11) followed by Defendants’ Reply (doc. 12). On January 27, 2000, Plaintiff filed a Motion for Partial Summary Judgment (doc. 16), followed by Defendants’ Response (doc. 20), and Plaintiffs Reply (doc. 24). In addition, Plaintiff filed a Declaration of Terry Hill in Support of Plaintiffs Motion for Partial Summary Judgment (doc. 25).
 

 Defendants’ Motion to Compel and Motion to Dismiss, Plaintiffs Motion for Partial Summary Judgment, as well as its Motion for a Declaratory Judgment raise similar basic issues and similar requests for relief. Therefore, the Court will review and analyze all of the pending Motions before us together.
 

 STANDARD OF REVIEW FOR SUMMARY JUDGMENT
 

 The narrow question that we must decide on a motion for summary judgment is whether there exists a “genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:
 

 [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial,
 

 Celotex Corp. v. Catrett,
 
 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 

 The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant’s case.
 
 Id.
 
 at 321, 106 S.Ct. 2548;
 
 Guarino v. Brookfield Township Trustees,
 
 980 F.2d 399, 405 (6th Cir.1992);
 
 Street v. J.C. Bradford & Co.,
 
 886 F.2d 1472, 1479 (6th Cir.1989). If the moving party meets this burden, then the non-moving party “must set forth specific facts showing there is a genuine issue for trial.” Fed.R.Civ.P. 56(e);
 
 see Guarino,
 
 980 F.2d at 405.
 

 As the Supreme Court stated in
 
 Celotex,
 
 the non-moving party must “designate” specific facts showing there is a genuine issue for trial.
 
 Celotex,
 
 477 U.S. at 324, 106 S.Ct. 2548;
 
 Guarino,
 
 980 F.2d at 405. Although the burden might not require the non-moving party to “designate” facts by citing page numbers, “ ‘the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.’ ”
 
 Guarino,
 
 980 F.2d at 405 (quoting
 
 InterRoyal Corp. v. Sponseller,
 
 889 F.2d 108, 111 (6th Cir.1989),
 
 *880
 
 ce
 
 rt. denied,
 
 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990)).
 

 Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party.
 
 Anderson v. Liberty Lobby, Inc., 477
 
 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment.
 
 McDonald v. Union Camp Corp.,
 
 898 F.2d 1155, 1162 (6th Cir.1990).
 

 DISCUSSION
 

 A.
 
 The Parties ’ Arguments
 

 In their Motion to Compel, Defendants move this Court to compel arbitration of the claims raised in Count I of the Amended Complaint and the Counterclaims raised in Counts I, III, and IV of the Amended Answer (doc. 4). Pursuant to the terms of the Purchase Agreement, Defendants assert that the Parties agreed to submit this dispute to a national accounting firm to render a decision within thirty (30) days (see doc. 4, Ex. A). Defendants further assert that the Parties also agreed that the arbitrator’s decision would be final and binding, and, thus, the Parties are obligated to arbitrate this dispute in accordance with the terms and provisions of the Purchase Agreement
 
 (Id.).
 

 Defendants also move this Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Count IV of the Amended Complaint on the grounds that this dispute is not yet ripe for judicial determination, and, thus, does not state a valid cause of action for a declaratory judgment. Specifically, Defendants allege that, according to the Premium Agreement, Plaintiff has no current right to receive any Premium Payments, and, therefore, no actual controversy exists between the Parties in regards to Plaintiffs right to receive those sums referred to in the Premium Agreement
 
 (see
 
 doc 4, Ex. B).
 

 Therefore, Defendants maintain that Count IV fails to state a claim under the Declaratory Judgment Act and should be dismissed accordingly.
 
 See
 
 Fed.R.Civ.P. 12(b)(6). In addition, Defendants request that, while this arbitration is pending, this Court should stay the present action pursuant to Title 9 U.S.C. § 3.
 

 In its Response, Plaintiff submits that, in order to claim an adjustment to the Purchase Price, § 1.3(c)(i) of the Purchase Agreement requires Noble to first “prepare and deliver to [Bratt] within sixty (60) days following the Closing Date (or as soon thereafter as practicable) a balance sheet for the Company as of [October 1, 1998]” (doc. 11). Plaintiff also submits that § 1.3(c)(iii) of the Purchase Agreement required Bratt to notify Noble “[w]ithin 30 days after the delivery of the Closing Balance Sheet ... as to whether [Bratt] disagree[d] with any amounts included in the Closing Balance Sheet”
 
 (Id.).
 
 Plaintiff asserts that § 1.3(c)(iii)-(iv) states that Noble’s proposed Closing Balance Sheet is “final and conclusive for all purposes” if Bratt fails to timely notify Noble of any disagreement
 
 (Id.).
 

 However, Plaintiff alleges that it was never timely notified of any dispute concerning the Closing Balance Sheet, and, therefore, Defendants have waived their right to arbitration of this issue. Specifically Plaintiff points out that § 1.3(e)(iii) of the Agreement states that, if Bratt disagreed with an amount included on Noble’s Closing Balance Sheet, which disagreement the Parties could not otherwise resolve within sixty (60) days of Bratt’s receipt of the Closing Balance Sheet, then the Purchase Agreement required the parties to “retain a national accounting firm ... to arbitrate the dispute.”
 
 (Id.).
 

 Furthermore, Plaintiff asserts that the Purchase Agreement contains a “limited” arbitration clause. According to Plaintiff, the arbitration clause is only applicable for purposes of resolving “disagreements” and “differences” with “any of the amounts included in the Closing Balance Sheet”
 
 *881
 

 (Id.).
 
 Moreover, Plaintiff alleges that, according to § 1.3(c) of the Purchase Agreement, arbitration is unavailable to resolve any other differences or disputes
 
 (Id.).
 
 Plaintiff contends that, the conditions precedent to any issue being arbitrable under § 1.3(c)(iii) of the Purchase Agreement are as follows:
 

 (i) The issue must appear on Noble’s December 7, 1998, Closing Balance Sheet or be contained in the February 2, 1999, supporting documentation to the December 7, 1998 Closing Balance Sheet; and
 

 (ii) The issue must have been disputed by Bratt in its February 18, 1999, response to Noble’s Closing Balance Sheet; and
 

 (iii) The issue must have been unresolved by the parties within 60 days of February 2,1999.
 

 (Id.).
 
 Plaintiff argues that, unless all three of the above conditions precedent are satisfied, any issue going to the Purchase Price or otherwise is not subject to the arbitration clause of § 1.3(c)(iii) of the Purchase Agreement
 
 (Id.).
 

 In addition, Plaintiff requests a declaratory judgment with respect to Count IV of the Amended Complaint (doc. 2). Plaintiff contends that in paragraph 6(e) of the Premium Agreement, Defendants agreed to pay Plaintiff between $500,000 and $2,000,000 over, at most, a five-year period as a premium payment based on the performance of H & H Steel during the period 1999 to 2003
 
 (Id.).
 
 Plaintiff alleges that Defendants have represented to Plaintiff that they do not intend on paying to Plaintiff the minimum sums due to it, which have created in Plaintiff a reasonable apprehension- that Defendants intend on breaching the terms and conditions of the Premium Agreement
 
 (Id.).
 

 [3]
 

 According to Plaintiff, there is an actual case and controversy between the Parties to this action as to the validity, enforceability, and expected breach of the Agreements
 
 (Id.).
 
 Plaintiff also seeks a declaratory judgment of its rights under the Agreements
 
 (Id.).
 

 [4]
 

 Lastly, Plaintiff alleges that Counterclaim I is not ripe for submission to arbitration because there is the fundamental preliminary legal issue and affirmative defense of “mutual mistake” which only this Court can resolve (doc. 11). Specifically, Plaintiff contends that through discovery, it expects to obtain evidence that will prove how certain accounts payable items were not within the contemplation of the Parties at the time the Agreements were formed, drafted, and executed
 
 (Id.).
 
 Plaintiff maintains that, because this threshold issue of “mutual mistake” is not within the scope of the arbitration clause, this Court should not refer this matter to arbitration until that issue has been determined by summary judgment, or, if necessary, by a trial on the merits
 
 (Id.).
 
 Plaintiff also asserts that, only if this Court should find that the Agreements should be reformed on the basis of the claimed mutu
 
 *882
 
 al mistake, may the Closing Balance Sheet issue be properly referred to arbitration.
 

 Moreover, in regards to Defendants’ Counterclaims III and IV, Plaintiff contends that, since these are mere breach of warranty claims that were not timely raised by Defendants, Counterclaims III and IV are not arbitrable under § 1.3(c)(iii) of the Purchase Agreement. Specifically, Plaintiff claims that Defendants cannot demand arbitration under § 1.3(c)(iii), but, rather, Defendants must seek other means of recourse governing breach of warranties.
 

 In their Reply, Defendants contend that Plaintiff is trying to avoid its obligation to arbitrate certain disputes pursuant to the terms of the Purchase Agreement signed by the Parties (doc. 12). Furthermore, Defendants allege that Plaintiff is asking this Court to award it judgment for incentive payments that are allegedly owed to Plaintiff pursuant to the Premium Agreement — the first payment of which will not be due until sometime in the first quarter of the year 2000
 
 (Id.).
 

 Defendants contend that they have never denied their obligation to perform pursuant to the Premium Agreement
 
 (Id.).
 
 However, Defendants allege that, since Plaintiff owes them more than $500,000, Defendants have exercised their legal right to claim this amount as a set-off to the alleged amounts owed to Plaintiff
 
 (Id.).
 
 Defendants argue that, since the Sixth Circuit encourages parties to arbitrate disputes pursuant to arbitration clauses in contracts, this Court should refer this matter to arbitration
 
 (Id.).
 

 Plaintiff subsequently filed a Motion for Partial Summary Judgment arguing that, in regards to Counts I, II, III, and V of its Amended Complaint, there are no genuine issues of material fact on these claims, and, thus, Plaintiff asserts that it is entitled to judgment as a matter of law (doc. 16). In their Response, Defendants counter that, since at least one of the above claims is required to be arbitrated pursuant to the terms of the Purchase Agreement between the Parties and because there is a genuine dispute as to whether Plaintiff is actually entitled to receive any money from Defendants on the remaining claims, Plaintiffs Motion for Partial Summary Judgment should be denied (doc. 20).
 

 In its Reply, Plaintiff argues that since Defendants do not offer any genuine issues of material fact in regards to Counts I, II, III, and V of the Amended Complaint, Plaintiff is indeed entitled to a partial summary judgment of those claims
 
 (Id.).
 
 Plaintiff offers in support of its Motion the affidavit and supporting exhibits of Terry Hill, President of Bratt Enterprises, Inc. (doc. 25).
 

 B.
 
 The Federal Policy Favoring Enforcement of Agreements to Arbitrate
 

 “The FAA establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitration.”
 
 Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,
 
 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). The issue before the Court in this matter, then, is whether Plaintiff agreed to arbitrate certain disputes with Defendants.
 
 See Ferro Corp. v. Garrison Indus., Inc.,
 
 142 F.3d 926, 933 (6th Cir.1998). We begin our analysis with a review of the Federal Arbitration Act (hereinafter, the “FAA”), Title 9 U.S.C. § 1,
 
 et seq.,
 
 and its purpose.
 

 The FAA embodies “the strong federal policy in favor of enforcing arbitration agreements.”
 
 Dean Witter Reynolds, Inc. v. Byrd,
 
 470 U.S. 213, 217, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). The FAA was enacted to provide for enforcement of privately entered agreements to arbitrate.
 
 See Mastrobuono v. Shearson Lehman Hutton, Inc.,
 
 514 U.S. 52, 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (noting that
 
 *883
 
 the central purpose of the FAA is to ensure “that private agreements to arbitrate are enforced according to their terms”);
 
 see also Ferro Corp.,
 
 142 F.3d at 932 (noting that the FAA was necessary in order “to overcome judicial reluctance to allow arbitration” as a means of deciding certain cases).
 

 Section 2 of the FAA provides that written agreements to arbitrate in a contract involving transactions in interstate commerce “shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.” 9 U.S.C. § 2 (West 2000). The Supreme Court has interpreted this phrase to mean that only claims for fraudulent inducement of the arbitration clause itself may be heard by a court.
 
 Prima Paint Corp. v. Flood & Conklin Mfg. Co.,
 
 388 U.S. 395, 403-404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967);
 
 see also
 
 9 U.S.C. § 4.
 

 Section 3 provides for a stay of proceedings in district courts when an issue is determined to be arbitrable.
 
 [5]
 
 9 U.S.C. § 3. Section 4 gives district courts authority to compel arbitration when a party neglects or refuses to comply with an arbitration agreement. 9 U.S.C. § 4;
 
 see also Stout v. J.D. Byrider,
 
 50 F.Supp.2d 733, 736 (N.D.Ohio 1999).
 

 The FAA requires courts to “rigorously enforce agreements to arbitrate.”
 
 Shearson/American Express, Inc. v. McMahon,
 
 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987);
 
 Dean Witter,
 
 470 U.S. at 221-22, 105 S.Ct. 1238 (We rigorously enforce agreements to arbitrate, even if the result is ‘piecemeal litigation,’ at least absent a countervailing policy in another federal statute.”). The Supreme Court has recognized that through the FAA, Congress has “declared a national policy favoring arbitration and withdrew the power of states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.”
 
 Ferro Corp.,
 
 142 F.3d at 932 (quoting
 
 Southland Corp. v. Keating,
 
 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984)). The FAA “leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.”
 
 Dean Witter,
 
 470 U.S. at 218, 105 S.Ct. 1238 (citing §§ 3 and 4 of the FAA);
 
 see also Stout,
 
 50 F.Supp.2d at 740: In construing a contract providing for dispute resolution by arbitration, we are mindful of the policy of the law that favors and encourages arbitration.
 
 Dean Witter,
 
 470 U.S. at 221, 105 S.Ct. 1238;
 
 Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,
 
 473 U.S. 614, 625, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985).
 

 In
 
 Council of Smaller Enterprises v. Gates, McDonald & Co.,
 
 80 Ohio St.3d 661, 665, 687 N.E.2d 1352, 1355 (1998), the Ohio Supreme Court described rules common to both the state and federal review of arbitration decisions. The Ohio Supreme Court emphasized four considerations.
 

 First, arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit.
 
 Gates, McDonald & Co.,
 
 80 Ohio St.3d at 665, 687 N.E.2d at 1355. Second, the question of arbitrability is an issue for judicial determination.
 
 Id.
 
 at 666, 687 N.E.2d at 1356. Third, in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on' the potential merits of underlying
 
 *884
 
 claims.
 
 Id.
 
 Fourth, where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless the court can say with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.
 
 Id.
 
 In other words, courts should resolve doubts in favor of coverage.
 
 [6]
 

 See WMA Securities, Inc. v. Ruppert,
 
 80 F.Supp.2d 786, 788 (S.D.Ohio 1999).
 

 C.
 
 The Court’s Analysis
 

 1.
 
 Count I of Plaintiff’s Amended Complaint
 
 — Breach
 
 of Contract, North Vernon Plant (doc. 2).
 

 The federal policy favoring enforcement of valid agreements to arbitrate disputes is now well-established.
 
 See Moses H. Cone Memorial Hospital,
 
 460 U.S. at 24, 108 S.Ct. 927. Accordingly, once a court has determined that a valid agreement to arbitrate a dispute exists, all other issues concerning the dispute must be referred to the arbitration forum.
 
 See Ferro Corp.,
 
 142 F.3d at .933 (citing
 
 Prima Paint,
 
 388 U.S. at 403-404, 87 S.Ct. 1801);
 
 see also Medika Int'l, Inc. v. Scanlan Int'l, Inc.,
 
 830 F.Supp. 81, 88 (D.P.R.1993) (“Having found the arbitration agreement valid, we refer all [other] issues arising from the [parties’ relationship] ... to the arbitrator.”).
 

 Included in the purchase price for the assets, Defendants agreed to pay “an amount equal to the actual cash expenditures for property, plant and equipment of the Company relating to the North Vernon Plant between July 31, 1998 and the Closing, as shown in the Closing Balance Sheet (determined as set forth in Section 1.3(c) below)” (Purchase Agreement at § 1.3(a)(ii)). The Parties also agreed that the Basic Price in the Purchase Agreement would be modified for adjustments as a result of the expenditures made for the North Vernon Plant (Purchase Agreement at § 1.3(c)). The Purchase Agreement provides, in pertinent part, as follows:
 

 The Basic Purchase Price set forth in Section 1.3(a) hereof will be subject to adjustments following the Closing Date (as hereinafter defined) as follows: (i) Purchaser will prepare and deliver to the Company within sixty (60) days following the Closing Date (or as soon thereafter as practicable) a balance sheet for the Company as of the opening of business on the Closing Date (the “Closing Balance Sheet”). The Closing Balance Sheet will be used to determine the amount of Assumed Liabilities as well as any adjustments pursuant to Section 1.3(a)(ii) ... hereof as of the Closing, for purposes of determining the Basic Purchase Price (the “Final Basic Purchase Price”).
 

 (Purchase Agreement at § 1.3(c)(i)).
 

 Due to the uncertainty associated with this post-Closing adjustment, the Parties included an arbitration clause in the Purchase Agreement to resolve any disputes associated with this adjustment, which has become the focus of the present case. The arbitration provision states, in pertinent part, as follows:
 

 If the parties are unable to resolve their differences within 60 days of their receipt of the Closing Balance Sheet, the Purchaser and the Company agree to
 
 *885
 
 retain a national accounting firm, other than the independent auditors used by Noble or the Company, to arbitrate the dispute and render a decision within 30 days of such retention, which decision will be final and binding for all purposes.
 

 (Purchase Agreement at § 1.3(c)(iii)).
 

 According to the allegations in the Amended Complaint, Plaintiff claims that the Actual Cash Expenditures were $780,-358.80 (doc. 2). However, Defendants have allegedly only paid Plaintiff $669,-494.80 of the total amount owed. Plaintiff claims that it was entitled to receive a larger adjustment to the Final Purchase Price than it actually received from Defendants. The Court finds that such a dispute is governed by the arbitration clause in § 1.3(e)(iii) of the Purchase Agreement.
 

 In applying the standard set forth in
 
 AT & T Technologies
 
 that the party resisting arbitration must meet in order to overcome the presumption in favor of arbitra-bility, we ask “whether, because of express exclusion or other forceful evidence, the dispute over the interpretation of [the relevant issue] is not subject to the arbitration clause.”
 
 Id.,
 
 475 U.S. at 652,, 106 S.Ct. 1415. Our inquiry is “ ‘strictly confined’ ... to whether the parties agreed to submit disputes over the meaning of [the relevant issue] to arbitration. Because the ... agreement contains a standard arbitration clause, the answer must be affirmative unless the contract contains explicit language stating that disputes respecting [the relevant issue] are not subject to arbitration, or unless the party opposing arbitration ... adduces ‘the most forceful evidence’ to this effect from the bargaining history.”
 
 Id.,
 
 475 U.S. at 654-55, 106 S.Ct. 1415 (Brennan, J., concurring);
 
 see also RE/MAX Int’l Inc. v. Zames,
 
 995 F.Supp. 781, 787, (N.D.Ohio 1998);
 
 Gates, McDonald & Co.,
 
 80 Ohio St.3d at 667-68, 687 N.E.2d at 1357.
 

 Finally, Plaintiff argues against referring Count I of the Amended Complaint to arbitration due to the affirmative defense of the “mutual mistake” that, existed between the Parties regarding the drafting of the portion of the Purchase Agreement in regards to accounts payable. However, Plaintiff does not claim that there was any “mutual mistake” in the negotiation of the arbitration clause itself.
 

 The Supreme Court has held that once a court determines that the agreement to arbitrate has not been fraudulently induced, all other issues falling within that agreement are to be sent to arbitration. In
 
 Prima Paint,
 
 the Court determined that a distinction must be made between fraud in the inducement of the agreement to arbitrate and any allegations of fraud concerning the contract as a whole.
 
 Id.,
 
 388 U.S. at 403-404, 87 S.Ct. 1801. The Supreme Court concluded in
 
 Prima Paint
 
 that, because the appellant' had failed to indicate that the “making” of the agreement to arbitrate, viewed in isolation from the contract as a whole, was induced by fraud, the case should be referred to arbitration.
 
 Id.
 
 at 406-407, 87 S.Ct. 1801;
 
 see also McMahon,
 
 482 U.S. at 238, 242, 107 S.Ct. 2332 (finding that the Security Exchange Act of 1934 & RICO claims are both subject to arbitration);
 
 Rodriguez de Quijas v. Shearson/American Express, Inc.,
 
 490 U.S. 477, 478-79, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (finding that claims arising under Securities Act of 1933 are subject to arbitration, thus, overruling the Court’s prior holding in
 
 Wilko v. Swan,
 
 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953));
 
 Ferro Corp.,
 
 142 F.3d at 931 (holding that “[u]nder the Supreme Court’s interpretation of the FAA, the issue of fraudulent inducement of the entire contract is an issue to be resolved by the arbitration process, in the absence of evidence that the contracting parties intended to withhold the issue from arbitration”) (citing
 
 Prima Paint,
 
 388 U.S. at 403, 87 S.Ct. 1801).
 

 In addition, Section 1.3(c)(iii) of the Purchase Agreement governs any dispute over adjustments to the Final' Purchase Price and states that in the event of any dispute
 
 *886
 
 over such adjustments, “the Purchaser and the Company agree to retain a national accounting firm, other than the independent auditors used by Noble or the Company, to arbitrate the dispute and render a decision within 30 days of such retention, which decision will be final and binding for all purposes” (doc. 4, Ex. A). The Court finds that the language of the arbitration clause is applicable to Count I of the Amended Complaint.
 

 Having reviewed this matter, the Court finds that such a dispute is governed by the arbitration agreement found in § 1.3(c)(iii) of the Purchase Agreement and the allegations of “mutual mistake” by Plaintiff is not relevant or applicable to the formation and applicability of the arbitration clause itself. Therefore, this Court will Order the Parties to arbitrate any and all disputes related to Count I of the Amended Complaint.
 

 2.
 
 Count IV of Plaintiffs Amended Complaint
 
 — Declaratory
 
 Judgment; Premium Performance Agreement
 

 Plaintiff alleges that, even though the time for Defendants to pay Plaintiff their annual Performance Premium is not yet due, nonetheless, Defendants are in breach of the Premium Agreement due to their anticipatory repudiation of the future payments that are due and owing to Plaintiff. Defendants counter this argument by asserting that it has a legal right to set-off the debt owed them by Plaintiff against the claims asserted by Plaintiff in its Amended Complaint. As a result, there is no actual case or controversy between the Parties regarding the Premium Agreement, and, therefore, a declaratory judgment would be improper under these circumstances at this time. Thus, Defendants move this Court to dismiss Count TV of the Amended Complaint.
 

 The Premium Agreement provides that Defendants would agree to pay certain incentives to Plaintiff during the five-year period after the asset purchase
 
 (see
 
 doc. 4, Ex. B, Premium Agreement at p. 1). The Premium Agreement provides, in pertinent part, the following:
 

 Purchaser hereby agrees to pay to the Company an annual performance premium (the “Performance Premium”) for each of the years ending December 31, 1999, December 31, 2000, December 31, 2001, December 31, 2002, and December 31, 2003. The Performance Premium payable in each of the five years shall be equal to a minimum of One Hundred Thousand Dollars ($100,000) and a maximum of Seven Hundred Fifty Thousand Dollars ($750,000), subject to an aggregate maximum payable hereunder of Two Million Dollars ($2,000,000), in accordance with the formula set forth below.
 

 (Premium Agreement at p. 1).
 

 The Premium Agreement contains a formula for the determination of the annual Performance Premium
 
 (Id.).
 
 The formula is based on Annual Sales of the plants purchased by Defendants. However, the determination of Annual sales is not required to be made until “thirty (30) calendar days after the end of Purchaser’s fiscal year”
 
 (Id.).
 

 Title 28 U.S.C. § 2201 governs declaratory judgments. The statute provides that:
 

 any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
 

 Id.
 

 The purpose of the Federal Declaratory Judgment statute is to provide a vehicle for individuals to avoid accrual of avoidable damages through an early adjudication.
 
 Travelers Ins. Co. v. Davis,
 
 490 F.2d 536, 543 (3d Cir.1974). It was also designed to act as. an alternative to injunctive relief
 
 *887
 
 and to be utilized to test the constitutionality of state statutes.
 
 Steffel v. Thompson,
 
 415 U.S. 452, 461, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974);
 
 American Home Assur. Co. v. Evans,
 
 791 F.2d 61, 64 (6th Cir.1986);
 
 see also Cleaver v. Wilcox,
 
 499 F.2d 940, 944 (9th Cir.1974).
 

 Nonetheless, a declaratory judgment action, like any other federal case, must present an actual case or controversy for review. Without an actual case or controversy, the jurisdictional requirements of the Declaratory Judgment Act and Article III of the Constitution are not satisfied. The Declaratory Judgment Act only allows courts to declare rights and obligations in a case of actual controversy. 28 U.S.C. § 2201(a). Furthermore, the “case or controversy” jurisdictional requirement of Article III of the Constitution applies to declaratory judgment actions.
 
 Kelley v. E.I. DuPont de Nemours & Co.,
 
 17 F.3d 836, 844 (6th Cir.1994).
 

 Defendants’ first fiscal year ends on December 31, 1999. Therefore, the first Performance Premium is not calculated until January 30, 2000 — 30 calendar days after the close of Defendants’ first fiscal year. Moreover, the other four years of the Performance Premium may not be determined until the amount of Annual Sales for those years can be determined. Thus, the time for calculating even the first portion of the Performance Premium had not yet been reached as of the date of the Parties filing their briefs in this matter.
 

 Having reviewed this matter, the Court finds that when the Amended Complaint is viewed in a light most favorable to Plaintiff, as is required under the standard of a review in a motion to dismiss, Count IV does state a claim upon which relief could be granted, and, thus, Plaintiffs Motion to Dismiss is not well-taken in regards to Count IV.
 
 See
 
 Fed.R.Civ.P. 12(b)(6);
 
 see also In re DeLorean Motor Co.,
 
 991 F.2d 1236, 1240 (6th Cir.1993). Specifically, Plaintiff asserts a claim for anticipatory repudiation in relation to Count TV and the future Premium Payments due to Plaintiff pursuant to the terms and conditions of the Agreements. Any dispositive action by this Court in regards to this claim would be premature. This is especially true since, as of the date of this Order, neither Party has submitted any evidence to the Court of the actual payment of, or the lack thereof, the Performance Premium due for 1999-2000 pursuant to the Agreements.
 

 Accordingly, the Court concludes that there is an actual controversy between the Parties to this action as the validity, enforceability, and possible anticipatory repudiation of the Agreements. Nonetheless, the Court also finds that genuine issues of material fact exists at this time which prevent this Court from granting summary judgment in favor of either Party in this action in regards to Claim IV.
 

 3.
 
 Defendants’ Counterclaims I, III & TV Asserted Against Plaintiff-Breach of Contract
 

 In Counterclaims I, III & IV of the Amended Answer (doc. 6), Defendants seek $1,476,672.00 (almost one and a half million dollars) from Plaintiff for Plaintiffs alleged breach of the Purchase Agreement. Defendants contend that they are required to plead certain counterclaims pursuant to Fed.R.Civ.P. 13(a), even though the Purchase Agreement requires these claims to be arbitrated. Specifically, included in the Counterclaims are causes of action for breach of contract relating to alleged adjustments to the Closing Balance Sheet.
 

 Since these items relate to the amount of Assumed Liabilities and Retained Liabilities under the Purchase Agreement, the determination of their value was to be made in the Closing Balance Sheet. Given the strong federal public policy favoring arbitration, the Court cannot say with positive assurance that the Parties did not intend to submit these issues to an arbitrator.
 

 
 *888
 
 Therefore, the Court finds that several of the issues raised in Defendants’ Counterclaims should be arbitrated pursuant to § 1.3(c)(iii) of the Purchase Agreement. As noted above, any disagreement regarding adjustments to the Closing Balance Sheet must be arbitrated. Included in the adjustments to the Closing Balance Sheet are adjustments due to the determination of Assumed Liabilities pursuant to § 1.3(c)(i) of the Purchase Agreement.
 

 Having reviewed this matter, the Court finds that Counterclaims I, III, and IV all relate to adjustments to the Closing Balance Sheet as each relates to the determination of the amount of Retained Liabilities and Assumed Liabilities of the Company. Accordingly, these claims should also be arbitrated.
 

 The Court finds also finds, in contrast to Plaintiffs assertions, that the issues raised in Counts I, III, and IV were raised in a timely manner by Defendants. However, even if the Court accepted Plaintiffs position that there was a delay in asserting these claims, we also must find that there has been no evidence put forward that there has been any prejudicial delay in this matter against Plaintiff or bad faith exhibited by Defendants in asserting their counterclaims. Therefore, we find that Defendants have not waived these claims. Accordingly, pursuant to § 1.3(c)(iii) of the Purchase Agreement, this Court will Order the Parties to arbitrate any and all disputes related to Counterclaims I, III, and TV of the Amended Answer.
 

 4.
 
 Plaintiff’s and Defendants’ Remaining Causes of Action
 

 Defendants assert that, in the interest of judicial economy, Counts II, III, and V of the Amended Complaint and Counterclaim II of the Amended Answer should be stayed pending the outcome of arbitration. Plaintiff moves this Court to grant summary judgment in favor of Plaintiff as to all remaining claims and counterclaims that are not submitted to arbitration.
 
 See H & M Charters, Inc. v. Reed,
 
 757 F.Supp. 859, 864 (S.D.Ohio 1991) (finding that in those situations where some, but not all, of the claims are subject to arbitration, the court must make a determination whether or not to stay the remainder of the case pending arbitration);
 
 CompuServe, Inc. v. Vigny Int’l Finance, Ltd.,
 
 760 F.Supp. 1273, 1281-82 (S.D.Ohio 1990).
 

 Having reviewed this matter, the Court finds Defendants’ arguments, as to this issue, to be unpersuasive. The Court further finds that, according to the terms of the arbitration clause, once the national accounting firm is chosen by the Parties to arbitrate Count I of the Amended Complaint and Defendants’ Counterclaims I, III and IV, the arbitrator, once chosen by the Parties, will have 30 days in which to render his or her decision (Purchase Agreement at § 1.3(c)(iii)). According to the terms of the arbitration clause, the arbitrator’s decision will be final and binding on the Parties for all purposes thereafter: Any award pursuant to this Section 1.3(c)(iii) may be entered in and enforced by any court having jurisdiction over the matter.
 

 Therefore, the Court is hopeful that during this period of arbitration, the Parties, with the assistance of the arbitrator, may find a way to settle not only those claims and counterclaims at issue before the arbitrator, but all of the claims and disputes that are involved in this action. However, if no settlement occurs, the Court finds that the 30-day arbitration period will not prejudice either Party. The Court finds that moving this case forward according to the Court’s February 1, 2000 Preliminary Pretrial Order will promote the interest of judicial economy and the interests of the Parties in resolving this action either by arbitration, settlement, or by a trial on the merits
 
 (see
 
 doc. 18).
 

 Accordingly, the Court does not find that the interest of judicial economy would be served by staying this action in relation to Counts II, III, and V of the Amended Complaint and Counterclaim II of the Amended Answer. Furthermore, having reviewed this matter, the Court finds that there are genuine issues of material fact
 
 *889
 
 remaining that prevent this Court from granting summary judgment at this time in relation to any of the claims or counterclaims asserted by the Parties in this action.
 

 CONCLUSION
 

 For the reasons set forth above, the Court hereby: (1) GRANTS Defendants’ Motion to Compel Arbitration (doc. 4); (2) DENIES Defendants’ Motion to Stay the Proceedings
 
 (Id.);
 
 (3) DENIES Defendants’ Motion to Dismiss Count IV of the (Amended) Complaint
 
 (Id.);
 
 and DENIES Plaintiffs Motion for Partial Summary Judgment (doc. 16).
 

 Accordingly, the Court hereby ORDERS the Parties to expeditiously submit Count I of the Amended Complaint and Defendants’ Counterclaims I, III, and IV to arbitration pursuant to the relevant terms and conditions of the Agreements
 
 (see
 
 doc.4, Exs. A & B). Finally, the Parties are also ORDERED to proceed in accordance with the Court’s February 1, 2000 Scheduling Order in relation to the remaining claims and counterclaims in this action
 
 (see
 
 doc. 18).
 

 SO ORDERED.
 

 [1]
 

 . In the Amended Complaint, Plaintiff alleges that the following claims against Defendants are liquidated damages, and, are thus, undisputed by Defendants: (1) Count I, breach of contract — North Vernon Plant; (2) Count II, breach of contract — reimbursement for discharge of tax liens; (3) Count III, breach of contract — transaction expense reimbursement; (4) Count IV, declaratory judgment— Premium Payments due on 03/30/2000, 03/30/2001, 03/30/2002, 03/30/2003; and (5) Count V — a claim for conversion of a refund
 
 (see
 
 doc. 2).
 

 [2]
 

 . In their Amended Answer, Defendants counter Plaintiff’s claims with the following counterclaims: (1) Counterclaim I, breach of contract — accounts payable in excess of $1.2 million; (2) Counterclaim II, breach of contract — accounts receivables that were not received within 90 days of Closing; (3) Counterclaim III, breach of contract — undisclosed liabilities; (4) Counterclaim IV, breach of contract — absence of fixed asset items (doc. 6).
 

 [3]
 

 . "Anticipatory repudiation” occurs when one party unequivocally informs the other that it no longer intends to honor their contract.
 
 See Equitable Trust Co. v. Western R. Co.,
 
 244 F. 485, 502 (S.D.N.Y.1917). Furthermore,
 

 [w]here the contract is renounced before performance is due, and the renunciation goes to the whole contract and is absolute and unequivocal, the injured party may treat the breach as complete and bring this action at once.
 

 Ricketts v. Adamson,
 
 483 U.S. 1, 17, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987) (quoting
 
 Roehm v. Horst,
 
 178 U.S. 1, 17, 20 S.Ct. 780, 44 L.Ed. 953 (1900)). The reason for the rule is plain, announcing one's purpose to default "destroys the assurance of the future performance that is central to a commercial contract.”
 
 Ricketts,
 
 483 U.S. at 17, 107 S.Ct. 2680.
 

 [4]
 

 . In the case of
 
 Jackson v. American Can Co.,
 
 485 F.Supp. 370, 373 (W.D.Mich.1980), the district court noted that:
 

 under this doctrine of anticipatory repudiation, if a party to a contract, prior to the time of his performance, unequivocally declares his intent not to perform, the innocent party has the option to either sue immediately for breach of contract or wait until the time of performance.
 

 Id.
 

 [5]
 

 . Courts may dismiss cases subject to reinstatement where there "is nothing left for the district court to do but execute judgment.”
 
 Arnold, v. Arnold Corp.—Printed
 
 Comm
 
 unications for Business,
 
 920 F.2d 1269, 1276 (6th Cir.1990);
 
 see also Raiola v. Union Bank of Switzerland, LLC,
 
 47 F.Supp.2d 499, 506 (S.D.N.Y.1999) (dismissing without prejudice to its reinstatement subject to the need for proceedings following arbitration);
 
 Rand v. J.C. Bradford & Co.,
 
 No. 98 Civ. 4906(DLC), 1998 WL 872421, *5 (S.D.N.Y. Dec.15, 1998) (same).
 

 [6]
 

 . In
 
 Gates, McDonald & Co.,
 
 the court summarized the holdings of the following Supreme Court cases concerning arbitration. In
 
 AT & T Technologies, Inc. v. Communications Workers of Am.,
 
 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986), the Court summarized four general principles, developed in prior decisions of that Court, to be applied when considering the reach of an arbitration clause. The essence of these general principles, are set out primarily in the
 
 "Steelworkers
 
 Trilogy”
 
 (United Steelworkers of America v. American. Mfg. Co.,
 
 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960),
 
 United Steelworkers of America v. Warrior & Gulf Navigation Co.,
 
 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960);
 
 United Steelworkers of America v. Enterprise Wheel & Car Corp.,
 
 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)) and repeated in
 
 Gates, McDonald & Co.,
 
 is pertinent to our review and provides a framework for our inquiry.